# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
April 4, 2006 Session

## BETTY POTTER, ET AL. v. FORD MOTOR COMPANY

### Appeal from the Circuit Court for Cumberland County
### No. CV003993      John J. Maddux, Jr., Judge

---

### No. E2005-01578-COA-R3-CV - FILED JUNE 21, 2006

---

While traveling on a rain-slick road at a moderate rate of speed, Betty Potter lost control of her 1997 Ford Escort which spun around and crashed into a tree. Her seat back collapsed into the rear seat and her spinal cord was severed. Betty Potter was rendered a paraplegic. She and her husband sued Ford Motor Company ("Ford") for the enhanced injuries Ms. Potter received as a result of the collapse of her seat back. The jury found Ford to be 70% at fault, Ms. Potter to be 30% at fault, and determined Ms. Potter's compensatory damages to be ten million dollars. Judgment was entered for Ms. Potter in the amount of seven million dollars. The primary issues Ford raises on this appeal are (1) whether the trial court erred in refusing to grant Ford a judgment notwithstanding the verdict; and (2) whether the trial court erred in refusing to instruct the jury on the doctrine of intervening cause. We hold that Ms. Potter presented material evidence from which the jury could reasonably conclude that the Ford Escort was defective, and that the trial court correctly found the intervening cause doctrine inapplicable in a case such as this one, where the alleged intervening cause is the negligent conduct of the plaintiff. We therefore affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

SHARON G. LEE, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., joined. HERSCHEL PICKENS FRANKS, P.J., filed a concurring opinion.

P. Edward Pratt and Ashley Meredith Lowe, Knoxville, Tennessee, and Fred J. Fresard and Jeffrey T. Gorcyca, Troy, Michigan, for the Appellant, Ford Motor Company.

Andrew R. Tillman, Knoxville, Tennessee, and Clifton M. Smart, III, Springfield, Missouri, for the Appellee, Betty Potter.

# OPINION

## *I. Factual and Procedural Background*

On September 26, 2002, Betty Potter was driving her 1997 Ford Escort on Genesis Road north of Crossville, Tennessee. It had been raining lightly that morning and the roads were wet. Ms. Potter testified that she had her seat belt on and was driving between 35 and 40 miles per hour in a 40 m.p.h. zone. The rear tires on her car were excessively worn; the passenger side rear tire had bald spots. Shortly after she rounded a curve in the road, the Ford Escort began to slide off the road, struck two road signs, spun around approximately 180 degrees, and, traveling backwards, struck a tree. The car was traveling approximately 30 miles per hour at the time of impact.

At the time of the accident, Ms. Potter weighed approximately 230 pounds. When the rear of the Ford Escort struck the tree, Ms. Potter's seat back collapsed, allowing her to "submarine" under her seat belt and strike the rear seat back. Her collision with the rear seat fractured four thoracic vertebrae, severed her spinal cord and paralyzed her from the chest down. Ms. Potter, who was 42 years old at the time of the wreck, lost the ability to walk, control her bladder or bowels, and tend to her daily needs. She is dependent on her husband and others to take care of her.

Ms. Potter and her husband sued Ford alleging that the seat back of the Ford Escort was defective and that Ford was negligent in that, among other things, it designed, manufactured, and distributed the Ford Escort with a seat frame of inadequate strength to prevent the seat back from collapsing in a foreseeable rear-end collision. Ms. Potter admitted responsibility for losing control of her car and thus causing the accident; therefore, her only claim for damages was for the enhanced injuries she incurred because of the seat back collapse and her collision with the back seat of the car. Ford answered, denying that the Ford Escort was defective and alleging, among other things, that Ms. Potter's comparative negligence was greater than Ford's and that her conduct was an intervening cause which superseded its own negligence, if any.

At the conclusion of the roughly three-week trial, the trial court declined to instruct the jury on the intervening cause doctrine, over Ford's objection. The jury returned a verdict finding Ford 70% at fault and setting Ms. Potter's total damages at ten million dollars. The jury did not award Mr. Potter any damages and he did not appeal.[1] Ford moved the trial court for judgment notwithstanding the verdict or for a new trial. The trial court denied the motion and, acting as thirteenth juror, expressly approved the verdict. The trial court entered judgment for Ms. Potter in the amount of seven million dollars, and Ford appealed.

---

[1] In closing argument, the Potters' counsel stated that Mr. Potter wanted whatever money the jury would allocate to him to go to his wife.

## II. Issues Presented

Ford raises the following issues for our review:[2]

(1) Whether the trial court erred in refusing to grant Ford a judgment notwithstanding the verdict because Ms. Potter failed to prove the Ford Escort was defective.

(2) Whether the trial court erred in refusing to instruct the jury on the doctrine of intervening cause.

(3) Whether the verdict form and jury charge on enhanced damages were deficient under Tennessee law.

## III. Defective Product

Ford argues that the trial court erred in refusing to grant it a judgment notwithstanding the verdict, because, it alleges, Ms. Potter failed to carry her burden of proving that the Ford Escort was defective when it left Ford's control. Our Supreme Court has stated the standard of review in ruling on a motion for judgment notwithstanding the verdict, or JNOV, as follows:

> The standards governing trial courts in ruling on motions for directed verdict or JNOV in negligence cases are well established. In ruling on the motion, the court must take the strongest legitimate view of the evidence in favor of the non-moving party. In other words, the court must remove any conflict in the evidence by construing it in the light most favorable to the non-movant and discarding all countervailing evidence. The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence. *Sauls v. Evans,* 635 S.W.2d 377 (Tenn.1982); *Holmes v. Wilson,* 551 S.W.2d 682 (Tenn.1977). If there is any doubt as to the proper conclusions to be drawn from the evidence, the motion must be denied. *Crosslin v. Alsup,* 594 S.W.2d 379 (Tenn.1980).

*Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994).

---

[2] Ford raises a total of four issues in its brief, but at oral argument before this court, counsel for Ford stated that it was abandoning its fourth issue on appeal.

In this case, we are presented not only with a ruling denying the motion for a JNOV, but also with a duly approved jury verdict. In the case of *Johnson v. Settle,* No. M1999-01237-COA-R3-CV, 2001 WL 585093 at *2 (Tenn. Ct. App. M.S., June 1, 2001), the court analyzed the relationship between the above-stated standard of review and the "material evidence" standard of review of a jury verdict, Tenn. R. App. P. 13(d), as follows:

> In *Alexander v. Armentrout,* our Supreme Court has recently discussed the interplay between the standard of review for directed verdict and the material evidence rule. In that case, the Court determined that the Court of Appeals had correctly stated the applicable standard of review for a motion for directed verdict, as set out above, but had misapplied the standard when evaluating the evidence. 24 S.W.2d at 271. The error on the part of the intermediate court was engaging in a *de novo* review of the evidence "in that it appears to have disregarded the jury's findings and to have reevaluated the evidence in its entirety." *Id.; see also Williams v. Brown,* 860 S.W.2d 854, 857 (Tenn.1993) (on review of the grant of a directed verdict, it is not the office of an appellate court to weigh the evidence.) In *Armentrout,* the Supreme Court then proceeded to examine the sufficiency of the evidence in the record to support the jury's specific factual findings, reflected in a special verdict form, and found, under the "no material evidence rule," that there was evidence to support those findings. 24 S.W.2d at 271, 272. Those findings of fact determined the legal issues involved, and the Court affirmed the trial court's denial of directed verdict. *Id.* at 274.

*Johnson v. Settle*, 2001 WL 585093 at *2. In *In re Estate of Brindley*, No. M1999-02224-COA-R3-CV, 2002 WL 1827578 (Tenn. Ct. App. M.S., Aug. 7, 2002), the court repeated the above-quoted observations, which correctly note, albeit implicitly, that while the *Armentrout* Court cited both the material evidence rule and the JNOV standard of review as applicable, it reviewed the record to determine if there was any material evidence supporting the verdict. *Alexander v. Armentrout,* 24 S.W.3d 267 at 271-72, 273 (Tenn. 2000). As the *Brindley* court noted, "[i]f there is material evidence to support the jury's findings, then, of necessity, granting a directed verdict for the losing party would have been improper because the evidence permitted reasonable minds to reach a conclusion different from that asserted by the losing party." *Brindley,* 2002 WL 1827578 at *2.

Under the material evidence standard, our review of a jury's factual findings in a civil action is limited to determining whether any material evidence supported the verdict. *Id.*; Tenn. R. App. P. 13(d). The appellate courts do not determine the credibility of witnesses or weigh evidence on appeal from a jury verdict. *Id.; Conatser v. Clarksville Coca Cola Bottling Co.,* 920 S.W.2d 646, 647 (Tenn. 1995); *Benson v. Tennessee Valley Elec. Coop.,* 868 S.W.2d 630, 638-39 (Tenn. Ct. App. 1993). Where the record contains material evidence supporting the verdict, the judgment based on

that verdict will not be disturbed on appeal. *Reynolds v. Ozark Motor Lines, Inc.,* 887 S.W.2d 822, 823 (Tenn. 1994); *Whaley v. Rheem Mfr'g Co.,* 900 S.W.2d 296, 300 (Tenn. Ct. App. 1995).

Keeping the above guidance in mind, based upon our review of the record, we hold the trial court did not err in refusing to grant Ford judgment notwithstanding the verdict, and that there is ample material evidence supporting the verdict.

Ford argues that "to establish a *prima facie* case, the plaintiff must prove 'the availability of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm.'" Ford cites the case of *Martin v. Michelin North America, Inc.,* 92 F. Supp.2d 745, 753 (E.D. Tenn. 2000) in support of this proposition. Ms. Potter responds by arguing that no Tennessee state court has stated that such a showing is required to establish a *prima facie* case under the Tennessee Products Liability Act. Ford does not dispute this proposition in its reply brief, nor does our independent research on Tennessee product liability law indicate otherwise.

While *Martin* does make such a statement, quoting with apparent approval the Restatement (Third) of Torts § 2, comment f, no court has subsequently cited this case for the proposition that a showing of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm is *always* required as an element of a plaintiff's *prima facie* case. The Tennessee Products Liability Act, T.C.A. § 29-28-101 *et seq.,* governs this case and it provides in relevant part:

> (a) A manufacturer or seller of a product shall not be liable for any injury to a person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.
>
> (b) In making this determination, the state of scientific and technological knowledge available to the manufacturer or seller at the time the product was placed on the market, rather than at the time of injury, is applicable. Consideration is given also to the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products.

T.C.A. § 29-28-105. Generally, the Tennessee cases stating what a plaintiff must show to establish a *prima facie* case for a defective product either quote, or closely track, the language of the statute above. *See, e.g., Baker v. Promark Products West, Inc.,* 692 S.W.2d 844, 849 (Tenn. 1985)("Plaintiff of course must bear the initial burden of establishing that the product was 'in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller'"); *Brown v. Crown Equipment Corp.,* 181 S.W.3d 268, 281 (Tenn. 2005); *Jackson v. General Motors Corp.,* 60 S.W.3d 800, 805 (Tenn. 2001); *Ray v. BIC Corp.,* 925 S.W.2d 527, 529

(Tenn.1996); *Rutherford v. Polar Tank Trailer, Inc.,* 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998).

Of course, evidence of a technologically feasible and practical alternative design that likely would have reduced or prevented plaintiff's harm will always be highly relevant and probative of the issue of whether a product was defective or unreasonably dangerous, as the language of T.C.A. § 29-28-105(b) provides. *Brown,* 181 S.W.3d at 278; *Hood v. Roadtec*, *Inc.,* 785 S.W.2d 359, 363 (Tenn. Ct. App. 1990). But while we have no quarrel with the outcome of the *Martin* case, we do not believe its statement quoted and relied upon by Ford accurately reflects the current state of Tennessee products liability law.

In her amended complaint, Ms. Potter elected to abandon her theory that the Ford Escort was "unreasonably dangerous" and proceeded upon the theories that it was in a "defective condition" and that Ford was negligent in its design and manufacture of the car. "Defective condition" is defined at T.C.A. § 29-28-102(b) as "a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." The essence of Ms. Potter's theory, as stated in her amended complaint, was that the Ford Escort "was defective when put to a use reasonably anticipated in that [t]he seat was designed and manufactured of inadequate strength to prevent its collapse in a foreseeable collision."

At trial, Ms. Potter presented the testimony of Dr. Kenneth Saczalski, a mechanical engineer and design engineering expert. Dr. Saczalski testified as follows as to his testing and analysis of the Ford Escort seat at issue, in addition to other, stronger seat designs that were available and in commercial use at the time of the accident:

> I examined the accident vehicle, reviewed some records of the accident itself, medical records, and I conducted some what we call quasi-static seat tests to look – to look at the strength of not only the seat involved in this vehicle but other seats by Ford, made by Ford and made by other manufacturers. So, there were some quasi-static seat strength tests that I conducted and others that I had conducted previously that I gathered together [to] see the comparison of strength in what we call quasi-static measurements. That's when we load the seat very slowly to see what the peak strength characteristics are.
>
> In addition to that, I ran a vehicle into a pole under conditions that simulated the actual accident condition, that is the speed, the offsets of impact, things of that nature with a surrogate or a dummy roughly the same size as Mrs. Potter and in a what we call OEM, original equipment manufactured, seat, the '97 Escort seat. We instrumented that dummy in the test. We took photographs. We made videos. We did high-speed videos. We made measurements before and after. Measured the damage of that vehicle after the test, compared it to the accident vehicle.

And then after that I ran another test. We ran a test where we took the same conditions, moved the pole just slightly, brought the vehicle into the pole slightly faster but with approximately the same size surrogate, but in this case we replaced the driver's seat with a stronger belt integrated seat, a 1996 [Chrysler] Sebring convertible design. And, again, the same types of measurements were made...and then these results were put together in a table and compared side by side to show the difference in response had someone the size of Mrs. Potter been in an accident of this severity in a different seat other than the one that she had.

In addition to that, I had done some other...more general tests looking at a wider range of impact severity, that is low velocities like ten miles per hour on up to 30 mile an hour impact changes, velocity changes, and also with a wider spectrum of occupants during these low velocity to high velocity...These tests were also run with a side by side comparison so you could see for the same size occupant under the same impact severity what the performance would be in one seat where in this case the driver's seat was the OEM, in this case a '95, we were looking at a '95 Escort compared to the '96 Sebring belt integrated seat.

\*　　　　　\*　　　　　\*

[I]n addition to that then I reviewed a number of publications, and articles, and learned treatises, and combined all of that data to look at what the history was and the knowledge within the public sector on seat design for let's say a seat that yields versus a seat that stays upright more or stays stronger.

Dr. Saczalski testified that the deficiency, or the unsafe aspect, of the Ford Escort seat design was that it was unable to absorb enough energy generated by the collision to prevent it from collapsing in an uncontrolled fashion. Dr. Saczalski stated that in the quasi-static test, the 1997 Ford Escort seat failed at a load of "a little over 1,000 pounds," whereas other available seat designs, some of which had been incorporated into other Ford vehicles, failed at loads ranging from over 2,000 pounds to over 4,500 pounds. The belt integrated seat on the 1996 Sebring failed at roughly 3,300 pounds.

Dr. Saczalski's pole-crash tests yielded the conclusion that, using a 232-pound dummy surrogate, the risk of an AIS (Abbreviated Injury Scale) 3+ neck injury, or an injury involving the tearing of soft tissue, with the Ford Escort seat design was approximately 73.31%, compared to approximately 3.58% with the Sebring seat design. The risk of an AIS 4+ head injury, described as a "very severe head injury," with the Ford Escort seat was approximately 52%, compared with a risk of less than 2% with the stronger Sebring design. Based on the results of his testing and analysis, Dr. Saczalski testified that his conclusion was "that had Mrs. Potter had the benefit of the stronger design which was available, commercially available, she would not have received her injuries based

-7-

on what you saw visually of the kinematics of the dummy and based on what we measured electronically comparing the two side by side."

After testifying for more than a full day at trial, Dr. Saczalski's direct testimony concluded as follows:

> Q: We started yesterday afternoon, Dr. Saczalski, with these five questions; was the seat in the 1997 Ford Escort unsafe when manufactured. Was it?
>
> A: It was, yes.
>
> Q: Were there feasible and economical design alternative[s] to correct any such design defects?
>
> A: Yes, there were.
>
>            *              *            *
>
> Q: Number four, did the unsafe condition in the Escort seat cause Betty Potter's paralysis based on your testing?
>
> A: Yes. Based on the results we showed you, the comparative results from our first two pole impact tests it did.
>
> Q: Would Betty Potter have been catastrophically injured in a belt integrated seat like the Sebring convertible seat in this wreck?
>
> A: The answer is no, as long as it was properly mounted to the vehicle interior. Even without that optimum headrest.

In his testimony, Dr. Saczalski described several and various seat designs that were feasible and in commercial use at the time of the 1997 Ford Escort's manufacture, that were engineered to withstand and absorb significantly more energy in a rear-end collision and thus be less likely to collapse uncontrollably. Dr. Saczalski testified that the estimated cost to Ford of incorporating a stronger seat design "would be roughly four and a half to maybe seven dollars, depending on the volume." He stated that he was familiar with a study by Ford in the early 1990s doing a product cost analysis of incorporating a seat-integrated restraint system, such as was in the Sebring, that concluded the additional manufacturing cost to be $6.64 per vehicle.

Ford's attack on Dr. Saczalski's analysis stems from the fact that in some of the tests, his data showed a slightly increased risk of injury with the Sebring seat design as compared with the Ford Escort design. For instance, in a test using a 176-pound dummy, rear impact, change of velocity 10 m.p.h., the approximate risk of an AIS 3+ (soft tissue) neck injury was 3.15% for the Ford Escort

and 4.41% for the Sebring. In a similar test conducted with a 30 m.p.h. change of velocity, the approximate risk of an AIS 3+ neck injury was 5.00% for the Ford Escort and 7.23% for the Sebring; but at the same time, the approximate percentage of the population at risk of an AIS 4+ (severe) head injury was 40% for the Ford Escort and less than 2% for the Sebring. A chart of data averaged in a pair of tests with a 238-pound dummy and impact resulting in a change of velocity of 30 m.p.h. showed a risk of severe head injury of 80% with the Ford Escort seat and less than 2% with the Sebring seat.

Dr. Saczalski testified as follows regarding the test data:

> Q: And so if one if the reasons given by a manufacturer is we're afraid we're going to have a lot more whiplash injuries if we go to the twice as strong belt integrated seat, anything in your test that would validate that?
>
> A: No. No. Now, like I said, some cases that – the 175 pound I think we were 4.81 percent risk of a whiplash injury versus 3.8 on the OEM seat, but that one percent difference between the two seats certainly can't justify not putting the stronger seat in when you see the devastating results at the higher velocity for the people that are really seriously injured, and permanently injured, and fatally injured.
>
>        *         *         *
>
> Q: In terms of the ten mile per hour low speed test that you ran, any significant difference, any significant risk of injury between the two kinds of seats?
>
> A: No, they're usually very close to one another or maybe one may be slightly higher but there's nothing significant at ten miles an hour.
>
>        *         *         *
>
> Q: When we look at your data as a whole rather than picking two blocks out of the thousand or so that are there, what do you conclude?
>
> A: You have to conclude that you're better off in [the] seat that has the, clearly no red boxes[3] in it, because that's the one at the more severe level. You don't cause any injury to the occupant in that seat, nor do you cause any injury to a rear occupant, other than maybe minor, lower torso possible injuries. And then when you go to the lower velocity range and look at the 10 mile an hour data, you also see that there may be some slight differences, where in some cases, not in all, but maybe in one or two of the surrogates, the average size

---

[3] In certain exhibits presented to the jury in chart form, the crash test data were placed in cells and the chart noted that "red boxed cells in Table indicate injury measures that exceed 1998 NHTSA [National Highway Traffic Safety Administration] injury values." The red boxed cells were all in the Ford Escort seat's columns.

surrogate male may show some slight increase because we didn't have an optimum headrest in the Sebring seat. But that doesn't mean you can't design it out, just like Ford did in their seat. They designed it out and they have a better headrest. And that's what could be done in here. I wouldn't penalize the Sebring seat because those numbers came out slightly different at 10 miles an hour, when I look at the catastrophic effects at the higher speeds.

Ford argues that because Dr. Saczalski's data shows a slightly increased risk of soft issue injuries for persons in a certain weight range in a 10 m.p.h. collision, Ms. Potter, as a matter of law, did not prove the Ford Escort seat design was defective, and the trial court should have granted a judgment notwithstanding the verdict. We do not agree. The data was presented to the jury, it was for the jury to decide, and the jury concluded that the Ford Escort was defective. There is abundant material evidence supporting this conclusion. We affirm the judgment of the trial court refusing to grant Ford a JNOV and approving the jury verdict.

### III. Intervening Cause Doctrine

Ford argues on appeal that it was error for the trial court to refuse to instruct the jury on the intervening cause doctrine. Ford's position is that the jury should have been allowed to consider whether Ms. Potter's own admittedly negligent conduct in losing control of her car was an independent, intervening cause of her injuries, such that it superseded Ford's negligence. Ms. Potter argues that all of the issues that were pertinent and relevant to this case were correctly submitted to the jury under the comparative negligence analysis and accompanying instruction, including issues of proximate cause and foreseeability. Ms. Potter argues that in such a case as this, where the alleged intervening cause is the negligent action of the plaintiff herself, the application of the intervening cause doctrine in addition to the comparative negligence doctrine is at best unnecessarily duplicative, and at worst an invitation to confusion and error. We hold that an intervening cause was not present in this case because only the conduct of Ms. Potter and Ford was to be considered - not the conduct of a third party. Accordingly, a jury instruction on intervening cause was not necessary, and if given would have been error.

The intervening cause doctrine operates to relieve a negligent actor from liability "when a new, independent and unforeseen cause intervenes to produce a result that the negligent actor could not have reasonably foreseen." *Rains v. Bend of the River,* 124 S.W.3d 580, 593 (Tenn. Ct. App. 2003); *White v. Lawrence,* 975 S.W.2d 525, 529 (Tenn. 1998). "The doctrine applies only when the intervening act (1) was sufficient by itself to cause the injury, (2) was not reasonably foreseeable to the negligent actor, and (3) was not a normal response to the negligent actor's conduct." *Rains,* 124 S.W.3d at 593; *Waste Mgmt., Inc. of Tenn. v. South Central Bell Tel. Co.,* 15 S.W.3d 425, 432 (Tenn. Ct. App. 1997); *Elosiebo v. State,* No. E2003-02941-COA-R3-CV, 2004 WL 2709206 at *2 (Tenn. Ct. App. E.S., Nov. 29, 2004). When the above elements are met, the intervening act is said to be a superseding cause, which "breaks the chain of proximate causation." *White,* 975 S.W.2d at 529; *Haynes v. Hamilton Co.,* 883 S.W.2d 606, 612 (Tenn. 1994); *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991). The conduct of the third party or other force supplants the

defendant's conduct as the legal cause of the plaintiff's injuries. Thus, the intervening, superseding cause relieves the defendant of liability to the plaintiff.

The following comment from the Supreme Court illustrates the interconnection between the concepts of intervening cause and proximate or legal cause, and the significance of foreseeability to both concepts:

> With respect to superseding intervening causes that might break the chain of proximate causation, the rule is established that it is not necessary that tortfeasors or concurrent forces act in concert, or that there be a joint operation or a union of act or intent, in order for the negligence of each to be regarded as the proximate cause of the injuries, thereby rendering all tortfeasors liable. See *Cartwright v. Graves,* 182 Tenn. 114, 184 S.W.2d 373, 381 (1944); *Whitehurst v. Howell,* 20 Tenn.App. 314, 98 S.W.2d 1071, 1081 (1936); *Morris v. Bolling,* 31 Tenn.App. 577, 218 S.W.2d 754, 758 (1949). There is no requirement that a cause, to be regarded as the proximate cause of an injury, be the sole cause, the last act, or the one nearest to the injury, provided it is a substantial factor in producing the end result. *Lancaster,* 390 S.W.2d at 221; *Kroger Co.,* 387 S.W.2d at 626; *Roberts* at 871. An intervening act, which is a normal response created by negligence, is not a superseding, intervening cause so as to relieve the original wrongdoer of liability, provided the intervening act could have reasonably been foreseen and the conduct was a substantial factor in bringing about the harm. *Solomon v. Hall,* 767 S.W.2d 158, 161 (Tenn.App.1988). "An intervening act will not exculpate the original wrongdoer unless it appears that the negligent intervening act could not have been reasonably anticipated." *Evridge v. American Honda Motor Co.,* 685 S.W.2d 632, 635 (Tenn.1985); *Ford Motor Co. v. Wagoner,* 183 Tenn. 392, 192 S.W.2d 840, 843 (1946). See also *Restatement (Second) of Torts,* Section 447 (1965). "It is only where misconduct was to be anticipated, and taking the risk of it was unreasonable, that liability will be imposed for consequences to which such intervening acts contributed." Prosser, supra. Just as in the case of proximate causation, the question of superseding intervening cause is a matter peculiarly for the jury because of foreseeability considerations. See *Brookins* at 550; *Evridge* at 635; *Young v. Reliance Electric Co.,* 584 S.W.2d 663, 669 (Tenn.App.1979).

*McClenahan,* 806 S.W.2d at 775-76.

-11-

There are several reasons why the intervening cause doctrine is inapplicable where the alleged intervening, superseding cause is the plaintiff's own negligent conduct. We initially note that Ford has not cited any Tennessee case holding the plaintiff's own negligent conduct to be an intervening, superseding cause, thereby cutting off his or her recovery, nor has our research revealed such a case. Although our courts have recognized that "suicide may constitute an intervening cause if it is a willful, calculated and deliberate act of one who has the power of choice," *White,* 975 S.W.2d at 530; *Rains,* 124 S.W.3d at 593 and cases therein cited, we are presented here with a plaintiff's negligent, not intentional, conduct.

In *Dunnivant v. Nafe,* 334 S.W.2d 717 (Tenn. 1960), the Tennessee Supreme Court adopted the following definition of "superseding cause" from the Second Restatement of Torts, § 440: "A superseding cause is an act of a *third person or other force* which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." *Id.* at 719 (emphasis added). We are of the opinion that the Restatement (Second) of Torts §440's definition of superseding cause as involving a "third person or other force" is not met when the alleged superseding cause is the conduct of either the initial defendant or that of the plaintiff. In the present case, there is no allegation of a third tortfeasor or other malfeasant force – only the negligence of the Plaintiff and the Defendant Ford, which are properly and adequately compared under our comparative negligence system, with no need for the intervening cause doctrine.

In *Perez v. McConkey*, our Supreme Court, abolishing the doctrine of implied assumption of risk, noted that "it would be ironic indeed if, after abolishing the all-or-nothing proposition of contributory negligence in *McIntyre* [*v. Ballentine,* 833 S.W.2d 52], we were to reinstate it here using the vehicle of assumption of risk." *Perez,* 872 S.W.2d 897, 905 (Tenn. 1994). We are of the opinion that applying the bar of intervening, superseding cause to a plaintiff's negligent conduct would mark a return to the "all-or-nothing proposition" rejected in *McConkey.* It is simply an unnecessary analysis when a much more refined and better legal tool – comparative negligence and comparative fault[4] – is now available.

Our review of jurisprudence from our jurisdictions addressing this question finds general agreement for this position. *See Von Der Heide v. Commonwealth of Pennsylvania,* 718 A.2d 286, 289 (Pa. 1998)(holding "a superseding cause was not present in this case because there was never a third party or event to be considered beyond the conduct of the defendant and the plaintiff."); *Barry v. Quality Steel Prods.,* 820 A.2d 258 (Conn. 2003)(stating that "the instruction on superseding cause complicates what is essentially a proximate cause analysis and risks jury confusion"); *Control Techniques, Inc. v. Johnson,* 762 N.E.2d 104, 108 (Ind. 2002)(the superseding cause "doctrine in today's world adds nothing to the requirement of foreseeability that is not already inherent in the requirement of causation"); *Torres v. El Paso Elec. Co.,* 987 P.2d 386 (N.M. 1999)(overruled on other grounds by *Herrera v. Quality Pontiac,* 73 P.3d 181 (N.M. 2003); *Brooks v. Logan,* 903 P.2d

---

[4]For a discussion of the difference between these two concepts, see *Turner v. Jordan,* 957 S.W.2d 815, 821 (Tenn. 1997) and *Owens v. Truckstops of America,* 915 S.W.2d 420, 425 n.7 (Tenn. 1996).

73 (Idaho 1995)(superseded by statute on other grounds); *Sumpter v. City of Moulton,* 519 N.W.2d 427 (Iowa Ct. App. 1994); *Roggow v. Mineral Processing Corp.,* 894 F.2d 246, 248 (7th Cir. 1990); *Laney v. Coleman Co., Inc.,* 758 F.2d 1299, 1305-06 (8th Cir. 1985); *Vasina v. Grumman Corp.,* 644 F.2d 112, 114-16 (2nd Cir. 1981).[5]

Ford argues on appeal that the circumstances of this case are so unusual (Ford characterizes them as "bizarre") that they were entirely unforeseeable. Ford asserts that it could not be expected to foresee that a seriously overweight plaintiff would be driving in the rain on badly worn tires, lose control of the car and collide backwards into a tree at roughly 30 miles an hour. However, as the *McClenahan* Court stated,

> The foreseeability requirement is not so strict as to require the tortfeasor to foresee the exact manner in which the injury takes place, provided it is determined that the tortfeasor could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred. *Roberts* at 871; *Wyatt* at 280-81. "The fact that an accident may be freakish does not *per se* make it unpredictable or unforeseen." *City of Elizabethton v. Sluder,* 534 S.W.2d 115, 117 (Tenn.1976). It is sufficient that harm in the abstract could reasonably be foreseen. *Shell Oil Co. v. Blanks,* 46 Tenn.App. 539, 330 S.W.2d 569, 572 (1959).

*McClenahan*, 806 S.W.2d at 775; *accord Bara v. Clarksville Mem. Health Systems, Inc.,* 104 S.W.3d 1, 12 (Tenn. Ct. App. 2002).

We do not agree that the harm in the abstract – a rear-end collision resulting in a change of velocity of approximately 30 m.p.h. – was unforeseeable to Ford when it was designing and manufacturing its Ford Escort seats. *See Ellithorpe v. Ford Motor Co.,* 503 S.W.2d 516, 519 (Tenn. 1973)(holding "collisions are clearly foreseeable by the manufacturer [who] therefore has a duty to minimize the harm of inevitable accidents by utilizing reasonably safe design"). But more important and relevant than our view on this issue is the fact that the trial court fully and accurately instructed the jury on the issues of proximate cause and foreseeability, and the jury rejected Ford's position. The trial court's refusal to instruct the jury on intervening cause did not take away its determination of foreseeability, as Ford argues.

---

[5] *See also* Michael D. Green, *The Unanticipated Ripples of Comparative Negligence: Superseding Cause in Products Liability and Beyond,* 53 S.C. L. Rev. 1103 (Summer 2002); Terry Christlieb, *Why Superseding Cause Should be Abandoned,* 72 Tex. L. Rev. 161 (Nov. 1993).

Further, the jury was instructed that Ford could only be held liable for Ms. Potter's enhanced injuries, those she suffered as a result of her collision with the back seat due to the collapse of the driver's seat, as follows:

> Ford Motor Company is not responsible for any injuries except those legally caused by Ford Motor Company. Ford Motor Company can only be responsible for any enhanced injuries.

> Enhanced injuries refers to the plaintiff's injuries, if any, that were caused by defects, if any, in the 1997 Ford Escort, or because of Ford's negligence, if any, over and above those injuries that probably would have occurred as a result of the accident absent any defect or negligence caused by Ford.

The jury's verdict thus reflected only the damages it found to have been caused by the defective seat back. The intervening cause doctrine applies only when the intervening act "was sufficient by itself to cause the injury." *Rains,* 124 S.W.3d at 593; *Waste Mgmt., Inc. of Tenn. v. South Central Bell Tel. Co.,* 15 S.W.3d 425, 432 (Tenn. Ct. App. 1997). In following the above instruction, the jury by necessity determined that Ms. Potter's negligent act in losing control of the car was not sufficient by itself to cause the injuries for which she sued Ford. Therefore, though we have held it was not error for the trial court to have found the intervening cause doctrine inapplicable under these circumstances, even if it was error, it was clearly harmless in light of the properly-approved jury verdict.

### IV. Jury Verdict Form

Ford argues that the verdict form and jury charge on enhanced damages were deficient under Tennessee law. Ford concedes that the enhanced injury instruction and the verdict form were in accordance with the principles articulated in *Cruze v. Ford Motor Co.,* No. 03A01-9907-CV-00245, 1999 WL 1206798 (Tenn. Ct. App. E.S., Dec. 16, 1999). *Cruze* was also an enhanced injury case involving the "crashworthiness" of a Ford Escort, and Ford here reiterates some of its arguments regarding the jury charge and verdict form. In this case, Ford argues that *Cruze* was incorrectly decided. We believe *Cruze* was well-reasoned and correctly decided. We have reviewed the verdict form and the jury instructions, and hold that they fairly and adequately instructed the jury in this case.

*V. Conclusion*

The judgment of the trial court approving and incorporating the jury verdict in favor of Ms. Potter is affirmed. Costs on appeal are assessed to the Appellant, Ford Motor Company.

_____

SHARON G. LEE, JUDGE