**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0578n.06

**Case No. 08-5959**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Aug 18, 2009**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| LATIVAFTER LIQUIDATING TRUST, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| CLEAR CHANNEL COMMUNICATIONS, | ) | DISTRICT OF TENNESSEE |
| INC., | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| _____ | ) | |

**BEFORE:  BATCHELDER, Chief Judge, CLAY, Circuit Judge; and COX[*], District Judge.**

**ALICE M. BATCHELDER, Chief Judge.**  In this contract dispute, Defendant-Appellant Clear Channel Communications, Inc. ("Clear Channel") appeals a jury award of compensatory damages and the district court's award of pre-judgment interest to Plaintiff-Appellee Eon Streams, Inc. ("Eon").[1]  For the reasons that follow, we AFFIRM.

**I.**

Clear Channel operates a network of approximately 1200 radio stations.  Prior to going out of business, Eon provided internet streaming services, which allow radio stations to broadcast live

---

[*]The Honorable Sean F. Cox, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1]On July 23, 2007, the district court granted Eon's motion to substitute "Lativafter Liquidating Trust" as the real party in interest.

programming on their websites. In January 2004, Eon and Clear Channel entered into a one-year, automatically renewable Service Agreement, under which Eon would provide internet streaming for some of Clear Channel's stations.

Later that year, Stephen Newman, Eon's chief executive officer, approached Brian Parsons, Clear Channel's Vice President of Technology, with a proposal for Eon to provide ad-insertion technology[2] for Clear Channel's internet broadcasts. On October 13, 2004, Newman e-mailed Parsons a "Letter of Agreement" ("LOA") that would amend the Service Agreement between Clear Channel and Eon. Under the proposed LOA, Eon would, among other things, develop and implement internet ad-insertion technology for Clear Channel. In return, Clear Channel was to extend the Service Agreement for a minimum three-year term and move all streaming radio stations within its network to Eon.

On October 19, 2004, Parsons sent an e-mail to Newman and Emma Woods of Eon, and to Kim Johnson, Clear Channel's Vice President of Sales and Marketing. Parsons began the e-mail by stating: "I am going to have to start from scratch on this but wanted to make sure the deal points were put into and verified via email first." Parsons then listed the deal points as including: (1) a three-year term under which Eon would be Clear Channel's preferred streaming partner; (2) Eon's maintaining competitive pricing, quality, and features; (3) Clear Channel's maintaining editorial control of network and branding; and (4) a 15% commission for Eon on any internet advertisement sale within Clear Channel's network. The same day, Johnson "replied to all" to note that the 15% commission would be on advertisement sales initiated by Eon, not on all sales.

---

[2]Ad-insertion technology allows a station to insert advertisements into its "streamed" internet broadcasts to replace the advertisements that air on the station's local radio broadcasts.

After another round of revisions between Eon and Clear Channel, Woods e-mailed Parsons what she referred to as "hopefully the final version" of the LOA on October 21, 2004. The next day, Parsons e-mailed Newman an "updated draft" of the LOA. Parsons wrote: "[A]s a reminder, I won't be able to get an answer on a three-year commitment until I confirm with my cohort VPs." The attached "updated draft" included all the deal points Parsons had listed in his October 19 e-mail, including the three-year term.

Parsons attended Eon's January 2005 board meeting and informed the board that the contract was "in legal" but assured them: "[W]e have a deal, so nobody has to worry about anything here; we do have a deal." At some point after that board meeting, Newman met with Jeffrey Littlejohn, a Clear Channel Senior Vice President. Newman testified that Littlejohn told him: "We've absolutely got a deal."

Over the next several months, Eon sought to secure a written expression of that deal so it could show potential investors that Eon had a solid commitment from Clear Channel. In an effort to get a signed LOA, Newman presented Parsons with several new proposals suggesting changing the term from three years to a one-year or two-year renewable term, and even expressing a willingness to eliminate Eon's commission on advertisement sales it initiated. Meanwhile, Eon began developing the ad-insertion technology. Parsons regularly met with Eon during this time. Representatives of Eon and Clear Channel together met with potential advertising customers. Clear Channel's internal communications referred to Eon's responsibilities to develop the ad-insertion technology and expressed an objective of moving all streaming stations over to Eon.

Parsons even joined Eon's board of directors. The minutes of Eon's April 2005 board meeting reflect that Parsons announced that Clear Channel was "committed to executing the written

3

contract . . . ." At Eon's July 2005 board meeting, Parsons assured the directors that a signed contract would be sent that day. That contract, however, never arrived.

In September 2005, Clear Channel signed an agreement with Akamai Technologies, Inc., one of Eon's competitors, to serve as Clear Channel's streaming provider. In November 2005, Clear Channel notified Eon of its intent to let its Service Agreement with Eon expire. In May 2006, Eon sold substantially all of its assets to a third party for $17 million.

Eon filed suit against Clear Channel, alleging breach of contract, promissory estoppel, and negligent misrepresentation. Both parties unsuccessfully moved for summary judgment, and the case proceeded to a jury trial. Following Eon's evidence and again at the close of all evidence, Clear Channel unsuccessfully moved for judgment as a matter of law under Rule 50(a). A jury found for Clear Channel on Eon's promissory estoppel and negligent misrepresentation claims, but found for Eon on the breach of contract claim and awarded Eon $40 million in damages. Clear Channel filed a post-verdict Rule 50(b) motion for judgment as a matter of law, or, in the alternative, a new trial; and Eon moved to alter the judgment to include pre-judgment interest. The district court denied Clear Channel's motion and granted Eon's, bringing the total award to approximately $44.2 million. Clear Channel timely filed its Notice of Appeal.

## II.

Clear Channel makes several arguments on appeal. First, it argues it was entitled to judgment as a matter of law because there was no "meeting of the minds" regarding Eon's proposed LOA, and thus no contract for it to breach. Next, Clear Channel contends that the district court erred in allowing Grady Vanderhoofen, an Eon board member, to testify regarding Eon's diminished value

4

and that Vanderhoofen's testimony was, in any event, insufficient evidence of Eon's damages. Finally, Clear Channel argues that the district court erred in awarding Eon pre-judgment interest.

**A. Was there a contract?**

We review a district court's denial of a Rule 50(b) motion *de novo*. *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (2007). "[I]n a diversity case, when a Rule 50 motion for judgment as a matter of law is based on the sufficiency of the evidence, this court applies the standard of review of the state whose substantive law governs the matter." *American Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 471 (6th Cir. 2004) (citing *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 506 (6th Cir.1998)). In Tennessee,

> The standards governing trial courts in ruling on motions for directed verdict or JNOV . . . are well established. In ruling on the motion, the court must take the strongest legitimate view of the evidence in favor of the non-moving party. In other words, the court must remove any conflict in the evidence by construing it in the light most favorable to the non-movant and discarding all countervailing evidence. The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence. If there is any doubt as to the proper conclusions to be drawn from the evidence, the motion must be denied.

*Potter v. Ford Motor Co.*, 213 S.W.3d 264, 267-68 (Tenn. Ct. App. 2006) (quoting *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994)) (internal citations omitted).

Clear Channel argues that the LOA regarding Eon's ad-insertion technology was not a contract because Clear Channel never accepted the terms of any of Eon's various offers. It contends that there was no meeting of the minds between it and Eon and that their volleys of e-mails and draft proposals were simply ongoing negotiations that never culminated in a mutual agreement.

Eon, on the other hand, argues that Parsons's October 22 e-mail with the attached "updated draft" of the LOA set forth an express contract between the parties. Eon contends that "[t]he jury

5

could legitimately have concluded that the only open item in November 2004 was whether Clear Channel would confirm a three-year term for the Letter of Agreement." Eon submits that "[t]he jury could have concluded that any doubt on this point was removed when Parsons attended the Eon board meeting in January 2005 and manifested Clear Channel's unqualified and unconditional acceptance by stating 'we have a deal.'" In other words, Eon argues that the evidence was sufficient for the jury to find that an express contract existed as of October 22, 2004, the date of the final LOA draft, or at least by January 2005, the date of Parsons's appearance before the Eon board.

"[A]n enforceable contract must, among other elements, result from a meeting of the minds and must be sufficiently definite to be enforced." *Rice v. N.N. Inc., Ball & Roller Div.*, 210 S.W.3d 536, 542 (Tenn. Ct. App. 2006) (quoting *Jamestowne on Signal, Inc. v. First Federal Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990)). Taking "the strongest legitimate view of the evidence in favor of" Eon, and "discarding all countervailing evidence" in favor of Clear Channel, *Potter*, 213 S.W.3d at 267, the jury reasonably could have concluded that the parties reached an agreement on the LOA's material terms. In replying to Emma Wood's October 21, 2004, e-mail containing the "hopefully [] final version" of the LOA, Parsons attached an "updated draft" containing all the "deal points" listed by Woods in her version. True, Parsons cautioned that he would have to get approval for a three-year term from his fellow Clear Channel Vice Presidents. This approval, however, was manifested by Parsons's and Littlejohns's subsequent assurances to Eon CEO Stephen Newman that they "had a deal." Moreover, the conduct of the parties also served as evidence that the deal was sealed: Eon and Clear Channel even made joint sales calls to potential advertising customers. Even if we were inclined to reach an opposite determination, we cannot say

6

"that reasonable minds could not differ as to the conclusions to be drawn from the evidence." *Potter*, 213 S.W.3d at 267.

**B.   Should the district court have allowed Vanderhoofven to testify, and was his testimony sufficient evidence of Eon's damages?**

Grady Vanderhoofven is a venture capitalist, the Executive Vice-President of Southern Appalachian Fund (which invested in Eon), and was a member of Eon's board.  Vanderhoofven testified that Eon's value would have been $57 million with the Clear Channel contract, instead of the $17 million it sold for in 2006.  As an investor in Eon, Vanderhoofven in 2005 investigated Eon's financials, retaining a market research firm to verify Eon's market potential.  When he became a member of Eon's board in March 2005, he received Eon's monthly financial reports, including income statements, balance sheets, and cash flow statements.  Vanderhoofven testified that between June 2004 and June 2005, the number of stations Eon was streaming increased by over 500%.  After June 2005, however, the revenue from Clear Channel began to dwindle, and Vanderhoofven determined that Clear Channel was moving its streaming business to another company. Vanderhoofven based his $57 million valuation on the revenue Clear Channel had been generating for Eon prior to the discontinuation of their business, and the projection for the 12-month period prior to Eon's sale.

Clear Channel argues, as an initial matter, that Eon cannot recover damages for its diminished value because Tennessee does not recognize diminished-value damages outside the context of commercial real estate, and because a potential loss in Eon's value was not contemplated by the parties when they entered into the contract.

7

In *BVT Lebanon Shopping Center, Ltd. v. Wal-Mart Stores, Inc.*, 48 S.W.3d 132, 136 (Tenn. 2001), the Tennessee Supreme Court upheld a diminished-value award to a shopping center whose value had decreased when its anchor tenant breached a covenant of continuous occupancy. The court held that its conclusion was in line with general contract remedies: "The purpose of assessing damages in breach of contract cases is to place the plaintiff as nearly as possible in the same position she would have been in had the contract been performed[.]" *Id.* (quoting *Lamons v. Chamberlain*, 909 S.W.2d 795, 801 (Tenn. Ct. App.1993)). "Generally speaking," the court recognized, "damages for breach of contract include only such as are incidental to or directly caused by the breach and may be reasonably supposed to have entered into the contemplation of the parties." *Id.* (quoting *Simmons v. O'Charley's, Inc.*, 914 S.W.2d 895, 903 (Tenn. Ct. App.1995)). The court in *BVT Lebanon* did not limit its holding to the commercial real estate context; indeed, it relied on basic principles of contract law to place the plaintiff in the position it would have enjoyed had the contract been kept.

Here, had Clear Channel not breached the contract, Eon would have had a fixed-term agreement to stream internet broadcasts for hundreds of radio stations, obviously increasing its attractiveness to potential investors and buyers. And by the time Clear Channel executives assured Stephen Newman and the Eon board that a deal was in place, Clear Channel knew that Eon was seeking assurances to mollify investors; Clear Channel knew that the amended Service Agreement was integral to Eon's financial health. Diminished-value damages were in order here and were not outside the contemplation of the contracting parties.

Clear Channel contends that even if diminished-value damages are allowed in this setting, they cannot be proven without expert testimony, and that Vanderhoofven's testimony as a lay opinion witness under Federal Rule of Evidence 701 was improper. "'We review for abuse of

8

discretion a district court's evidentiary rulings, including rulings on witness testimony under Rule[]

701 . . . of the Federal Rules of Evidence.'" *United States v. White*, 492 F.3d 380, 398 (2007)

(quoting *JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 370 F.3d 519, 524 (6th Cir.2004)).  That

Rule provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.  The advisory commission notes to the 2000 amendments to Rule 701 provide:

> [M]ost courts have permitted the owner *or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert.  See, e.g., Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business).  Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

*Id.* (emphasis added).

As an investor who researched Eon's financial condition, and later as a member of Eon's

board, Vanderhoofven had personal, particularized knowledge of Eon's value.  The district court did

not abuse its discretion in permitting him to testify about Eon's projected value if it had retained

Clear Channel's business.  Moreover, contrary to Clear Channel's assertions, Vanderhoofven's

testimony rested on a sufficient foundation — his personal research into Eon's financial reports.[3]

---

[3]On March 13, 2009, Clear Channel moved this Court to certify three questions of law to the Supreme Court of Tennessee under Tennessee Supreme Court Rule 23.  Specifically, Clear Channel asked us to inquire of that court: "(1) whether Tennessee would permit a corporate plaintiff to recover $40 million in diminished value damages for a breach of contract that does not involve either permanent damage to real estate or a covenant of continuous occupancy; (2) whether Tennessee permits a plaintiff to recover diminished value damages for a breach of an implied contract; and (3) whether Tennessee required diminished value damages to be proven by expert testimony."  Because we hold that an

**C. Should the district court have awarded Eon pre-judgment interest?**

We review for an abuse of discretion a district court's prejudgment-interest award. *Gentek Bldg Products, Inc. v. Steel Peel Litigation Trust*, 491 F.3d 320, 333 (2007) (quoting *Anderson v. Whittaker Corp.*, 894 F.2d 804, 809 (6th Cir.1990)). "There is no dispute that in a diversity action the question of prejudgment interest must be determined under state law." *Daily v. Gusto Records, Inc.*, 14 F. App'x 579, 591 (6th Cir. 2001) (citing *Mass. Benefit Ass'n v. Miles*, 137 U.S. 689 (1891)). Tennessee law favors "awarding prejudgment interest whenever doing so will more fully compensate plaintiffs for the loss of use of their funds. Fairness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received." *Scholz v. S.B. Intern., Inc.*, 40 S.W.3d 78, 83 (Tenn. Ct. App. 2000). The court determined that "Eon's demise was assured when Clear Channel breached the parties' contract on September 9, 2005." The court then calculated interest as accruing from that date at a rate equal to 4.666%, the average rate from September 9, 2005 to December 14, 2007. The district court did not abuse its discretion in awarding Eon prejudgment interest.

## III.

Accordingly, we **AFFIRM** the judgment of the district court.

---

express contract existed between Eon and Clear Channel, that the Tennessee Supreme Court in *BVT Lebanon* did not limit its holding to the real estate context, and that Federal Rule of Evidence 701 permits Vanderhoofen's testimony, we hereby **DISMISS** Clear Channel's motion to certify.