# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
July 20, 2011 Session

## AUNDREY MEALS, as Natural Parent, Guardian, and Next Friend of WILLIAM MEALS v. FORD MOTOR COMPANY

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-000254-03     Donna M. Fields, Judge**

---

**No. W2010-01493-COA-R3-CV - Filed April 13, 2012**

---

Following a seven week trial, the jury returned a verdict in favor of Plaintiff in this products liability action. The jury awarded compensatory damages in excess of $43 million, and assessed 15 percent fault against Defendant car manufacturer. Defendant appeals. We affirm the jury verdict with respect to liability but remand with a suggestion of remittitur.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., joined. HOLLY M. KIRBY, J., filed a dissenting opinion.

J. Randolph Bibb, Jr., and Ryan N. Clark, Nashville, Tennessee, for the appellant, Ford Motor Company.

J. Houston Gordon, Covington, Tennessee, for the appellee, Aundrey Meals, as natural parent, guardian and next friend of Williams Meals.

## OPINION

This is a products liability action. Defendant car manufacturer appeals a jury verdict finding Defendant liable for enhanced injuries to a six-year old boy who was catastrophically and permanently injured in a 2002 collision while a passenger in the rear seat of a vehicle manufactured by Defendant. Plaintiff filed claims on behalf of her minor son, seeking damages for enhanced injuries that she asserted were caused by an allegedly defective or unreasonably dangerous passenger restraint system that she alleged was inadequate to protect a small child. Defendant denied liability, asserting the three-point seat belt system was neither defective nor unreasonably dangerous, but was misused where the shoulder strap

portion was placed behind the child's back. Following a seven-week trial and after deliberating for three days, the jury awarded damages to Plaintiff in the amount of $43,800,000.00, and assessed 15 percent fault against Defendant. Defendant appeals. Finding material evidence to support the jury verdict with respect to liability for failure to warn, we affirm the assessment of fault against Defendant. Finding that damage award is excessively high so as to demonstrate passion on the part of the jury, we remand with a suggestion of remittitur.

"Tragic" does not adequately describe the background events giving rise to this lawsuit. We express our agreement with the parties that this tragedy resulted, in large part, from a public policy gap that left millions of American children like Billy vulnerable and unprotected while riding as passengers in the family car. Billy's story emphasizes, in the strongest and most unhappy terms, the importance of securing children in approved child restraint systems as now required by law.

The events leading to this lawsuit are not disputed. On January 18, 2002, John Harris (Mr. Harris), driving under the influence of cocaine and alcohol, sped through the City of Memphis in a 1975 Oldsmobile Cutlas at speeds sometimes exceeding 100 miles-per-hour. Police officer Bridgette King ("Officer King") spotted Mr. Harris traveling eastward on Raleigh-LaGrange Road at a speed of 81 miles-per-hour. Officer King pursued Mr. Harris onto Covington Pike. Mr. Harris sped northbound in the southbound lane, and collided head-on with a 1995 Mercury Grand Marquis ("the Grand Marquis") owned and operated by Billy's grandfather, James Albert Meals (Mr. Meals Sr.). At the time of the collision, Mr. Harris was traveling at a speed of 83 to 98 miles per hour. The Meals' vehicle was traveling at 12 to 25 miles-per-hour, and was struck with force sufficient to cause it to travel backwards at a rate of 25 miles-per-hour in a span of about one-tenth of a second. The crash was more severe than 99.9 percent of automobile accidents. Mr. Meals Sr. and his son, Billy's father James Harvey Meals (Mr. Meals), died at the scene of the collision. Six-year old Billy suffered permanent, catastrophic injuries.

Billy was a passenger in the back seat on the driver's side of his grandfather's Grand Marquis when the collision occurred. He was not restrained in a booster seat, but was wearing the three-point lap-and-shoulder seat belt installed by Ford in the Grand Marquis. However, because the seat belt did not fit a 59 pound, 47 inch tall child like Billy, the shoulder strap was too long for Billy and had been placed behind his back to keep it from crossing his face. It is not disputed that a child booster seat was not statutorily required for a child of Billy's age and size at the time of the accident. The collision caused Billy's body to "jack-knife" over the fulcrum created by the lap belt portion of the seat belt, and he suffered injuries to his spine that left him permanently paralyzed.

### *Procedural History*

In January 2003, Billy's mother, Aundrey Meals (Ms. Meals), acting as Billy's natural parent, guardian, and next of friend, filed an action against the City of Memphis; Walter Crews (Mr. Crews), individually and as Director of the Memphis Police Department; Officer King, individually and as a member of the City of Memphis Police Department; and Ford Motor Company ("Ford"), which manufactured the Grand Marquis. In February 2003, the City of Memphis, Mr. Crews, and Officer King filed a notice of removal of Ms. Meals' claims under 28 U.S.C. §§ 141 and 1446 to federal court. In March 2008, the federal court dismissed Ms. Meals' federal law claims and remanded her state law claims to the Circuit Court for Shelby County. In October 2008, the trial court entered an order permitting Ms. Meals to amend her complaint to reflect the status of the case, and Ms. Meals' filed a second amended complaint on October 27, 2008, naming the City of Memphis and Ford as Defendants. In September 2009, the trial court entered an order approving a settlement with the City of Memphis awarding damages to Billy in the amount of $75,000. The trial court also entered a consent order dismissing Ms. Meals' claims against the City of Memphis, with prejudice. Accordingly, the remainder of the lawsuit litigated in the trial court was confined to the claims asserted by Ms. Meals against Ford in her second amended complaint (her "complaint").

In her complaint, Ms. Meals asserted claims against Ford under theories of negligence, comparative fault, gross negligence, misrepresentation, breach of express and implied warranties of merchantability and fitness for a particular purpose. She also asserted that Ford was strictly liable pursuant to Tennessee Code Annotated § 29-28-101, *et seq.*, the Tennessee Product Liability Act of 1978. Ms. Meals sought damages for Billy's past and future injuries, including personal injuries; medical expenses; permanent impairment and disfigurement; loss of the enjoyment of life; lost wages; pain and suffering; and mental, physical and emotional injuries. In her complaint, Ms. Meals asserted that the seat belt/safety restraint system of the 1995 Grand Marquis was defective or unreasonably dangerous when sold, and that Ford had "insufficiently warned the purchasers and users thereof of the danger of the seat belt" to children of Billy's age and size. She alleged that, through its promotional literature, advertising, and instructions to users, Ford promoted the product as being safe for use by children, despite knowing this to be untrue. Ms. Meals asserted Ford had actual and/or constructive notice that the seat belt system was not safe for children, but negligently and/or intentionally failed to warn consumers and users of the defective and/or dangerous nature of the product. She further asserted that Mr. Meals had used the seat belt system as "might be reasonably expected and as directed and/or foreseen" by Ford, and that the seat belt system was unreasonably dangerous to "those reasonably expected to be exposed to it," including Billy. Ms. Meals asserted Ford had failed to take steps that were reasonably necessary to protect those who might be exposed to its dangerous product. She prayed for compensatory

damages in the amount of forty-million dollars, and punitive damages in an amount to be determined by a jury.

Ford answered in November 2008, denying liability and moving for dismissal for failure to state a claim under Rule 12.02 of the Tennessee Rules of Civil Procedure. In its answer, Ford denied that the Grand Marquis was defective or unreasonably dangerous; denied Ms. Meals' claims of negligence; denied the seat belt system was the cause of Billy's injuries; and asserted the defense of the comparative fault of others. Ford asserted that the 1995 Grand Marquis had been designed, manufactured and sold in accordance with the available scientific and technological knowledge available, and in accordance with customary designs and standards. It asserted the Grand Marquis was reasonably safe and not defective, and that Billy's injuries resulted from a superseding intervening cause beyond its control. Ford asserted the comparative fault of James Harvey Meals; Aundrey Meals; the City of Memphis, Mr. Crews; Officer King; and Mr. Harris. Ford further asserted that Ms. Meals' claim for punitive damages could not be sustained because the 1995 Grand Marquis complied with all applicable motor vehicle safety standards, creating a presumption that the vehicle was reasonably safe and not defective.

Ford moved for summary judgment on all of Ms. Meals' claims in August 2009. In September 2009, over Ford's objection, the trial court entered an order granting Ms. Meals' motion to increase her demand for compensatory damages to sixty-million dollars, and to assert punitive damages in the amount of sixty-million dollars. Following the litigation of numerous pre-trial motions, Ford's motion for summary judgment was heard in the trial court on September 9, 2009. The trial court determined that Ms. Meals had not contested Ford's motion for summary judgment with respect to her claims for breach of express warranty and misrepresentation; breach of warranty for merchantability, negligence *per se*; in her individual capacity for her own personal damages, and for the wrongful death of James Harvey Meals. The trial court accordingly dismissed those claims. The trial court determined that genuine issues of material fact existed with respect to Ms. Meals' claims related to a defective and/or unreasonably dangerous product; failure to warn; fitness for a particular purpose; common law negligence; and punitive damages. It accordingly denied summary judgment with respect to those claims.

The matter was tried before a jury from September 21, 2009, through November 13, 2009. On September 24, the parties stipulated to medical bills for Billy through February 19, 2009, in the amount of $552,920. On the same day, Ford amended its answer to include its previous assertions and adding affirmative defenses relying on the Tennessee Product Liability Act as codified at Tennessee Code Annotated § 29-28-101, *et seq*, asserting that, under the Act, there existed a rebuttable presumption that the Grand Marquis was not unreasonably dangerous where it complied with the applicable State and federal standards.

-4-

Ford again asserted that a superseding intervening cause beyond its control caused the injuries to Billy. If further relied on the defense of an unforseeable alteration, change, improper maintenance, misuse or abnormal use, and/or failure to follow proper instructions, if proven applicable by investigation and discovery. It again asserted the defense of comparative fault. Ford further asserted that Ms. Meals' claims and assertions regarding its choice of restraint system in the rear seat of the Grand Marquis were preempted, at least in part, by the Federal Motor Vehicle Safety Standards codified at 49 C.F.R. § 571.208, 209, 210, & 213 (1994). It asserted that Ms. Meals' claim for punitive damages could not be sustained under Tennessee law or under the due process clause of the Fourteenth Amendment to the United States Constitution. Ford also adopted and incorporated its responses with respect to Ms. Meals' claims for common law negligence and misconduct and negligence *per se*, asserting that those claims had been made against the City of Memphis, and required no response from Ford.

Ford moved for a directed verdict at the close of Ms. Meals' case in chief. In its motion, Ford stated that Ms. Meals' action had been "winnowed down" to strict liability defect and failure to warn; negligence; breach of the implied warranty of fitness for a particular purpose; and punitive damages. It asserted,

> [a]ll of those claims boil down to the same basic allegations - the right rear seat belt system in the Grand Marquis was defective and unreasonably dangerous because it was not a five-point integrated child restraint system and because Ford failed to warn of various things concerning the installed system.

Ford asserted that, notwithstanding the amount of evidence introduced at trial, the only testimony presented that was relevant to Ms. Meals' claims was the design and warnings expert testimony presented by two witnesses. Ford asserted that the witnesses had failed to establish that the three-point restraint system was defective or unreasonably dangerous, or that it would be unsafe for normal anticipated use by children. The trial court granted Ford's motion with respect to Ms. Meals' claim of breach of warranty for a particular purpose, and denied the motion with respect to her claims of strict liability, negligence, failure to warn, and punitive damages.

Ford renewed its motion for directed verdict at the close of all proof. The trial court denied the motion on November 12, 2009. The matter was submitted to the jury on Ms. Meals' claims of enhanced injuries under theories of strict liability; negligent design, manufacture, testing and/or inspecting; failure to warn; and on her claim for punitive damages. The jury also was instructed to consider the potential comparative fault of Billy's father for failing to properly restrain Billy, the fault of Mr. Harris, and the fault of Ms. Meals. Ford did not allege comparative fault on the part of Mr. Meals Sr., who owned the

Grand Marquis and was operating it at the time of the collision.

On November 13, 2009, the jury returned a verdict in favor of Ms. Meals. The jury awarded compensatory damages in the amount of forty-three million, eight-hundred thousand dollars ($43,800,000). It assessed 70 percent fault to Mr. Harris for causing injuries to Billy. The jury assessed 15 percent fault to Mr. Meals and 15 percent to Ford for Billy's enhanced injuries. It assessed no fault against Ms. Meals. The jury did not find that Ford had acted intentionally, recklessly, maliciously or fraudulently, and it did not award punitive damages. The trial court entered judgment on the verdict on November 20, 2009.

Pursuant to Rules 50.02 and 59 of the Tennessee Rules of Civil Procedure, Ford moved for a judgment in accordance with its motion for a directed verdict and, in the alternative, for a new trial. Following a hearing on May 14, 2010, the trial court denied Ford's motions on May 25, 2010. The trial court granted Ms. Meals' motion for costs, in part, and entered an order awarding costs in the amount of $100,499.00. The trial court entered final judgment in the matter on May 25, 2010, and Ford filed a timely notice of appeal.

The parties' final brief was filed in this Court on April 7, 2011, and we heard oral argument on July 20, 2011. Upon review of the record and consideration of the parties' arguments, on September 15, 2011, we ordered the parties to submit supplemental briefs on the public policy issues implicated in the matter in light of the statutory provisions found in Tennessee Code Annotated § 55-9-601 through 605(2008 & 2011 Supp.). Supplemental briefing was completed on January 10, 2012.

### Issues Presented

Ford presents the following issues for our review:

(1)     Was there "material evidence" to support the jury's verdict against Ford?

(2)     Did the trial court err in denying Ford a directed verdict on punitive damages and Plaintiff's warnings claim and by later instructing the jury on these unsupported theories?

(3)     Was the jury's verdict of $43.8 million compensatory damages award, which included $39.5 million in noneconomic damages, excessive beyond the "range of reasonableness," and improperly motivated by a desire to punish?

(4)  Did the trial court's numerous evidentiary and procedural errors throughout trial individually or cumulatively harm Ford to the extent that a new trial is warranted?

### *Discussion*

We begin our discussion by again noting that the verdict in this case was a general jury verdict, and we are unable to determine whether the jury found Ford liable under a theory of strict liability, negligent design, or the failure to warn. Before turning to the issues presented for our review, we also note that most of the background facts are not disputed. We also reiterate that Ms. Meals' claims against Ford are predicated on an allegation that the three-point rear passenger restraint system installed in the Grand Marquis was unreasonably dangerous or defective because it was not designed to adequately protect children, who are foreseeable passengers. There is no evidence in the record that the three-point seat belt system was not properly installed in the Grand Marquis, or that the system failed mechanically. Further, the evidence in the record is that the "safety cage"contained within the passenger compartment of the Grand Marquis performed remarkably well. The parties stipulated that the 1995 Grand Marquis complied with all applicable Federal Motor Vehicle Safety Standards ("FMVSS") when it was manufactured and sold, including, but not limited to, standards relating to "occupant crash protection," "seat belt assemblies," and "seat belt anchorages." Ms. Meals asserts, however, that the safety standards included no standard applicable to a torso or shoulder strap to adjust to fit a six-year old child.

There also is no dispute that the three-point seat belt did not fit Billy properly at the time of the accident, or that the seat belt shoulder strap was improperly placed behind Billy to keep it off of his face. Ms. Meals testified at trial that she knew that the shoulder harness should have been placed across Billy's chest, but that she and Mr. Meals nevertheless allowed Billy to ride with the shoulder harness placed behind his back because the shoulder strap crossed Billy's face. She asserted that she had no knowledge that allowing Billy to wear the seat belt in this manner could cause injury.

It is undisputed that the statutory scheme as it existed at the time of the accident did not require children of Billy's age and size to be restrained in a booster seat. Ms. Meals testified that she nevertheless had purchased a booster seat and an adjustable seat clip for Billy in an attempt to position him properly. She testified that the shoulder strap came across the bottom of Billy's face, despite the adjustable clip, however, and that she did not purchase another booster seat. There is no dispute that placing the shoulder strap behind Billy's back was a misuse of the seat belt. It also is not disputed that placing the shoulder belt behind a passenger may cause the passenger to jack-knife over the lap belt in the case of a collision, causing injuries to the passenger's spine, like those suffered by Billy.

Although Ford asserts that the three-point seat belt is neither defective nor unreasonably dangerous when worn properly, there does not appear to be any evidence in the record to suggest that a five-point, integrated child restraint system ("ICRS") is not superior to a three-point system for children riding in the rear seat of passenger vehicles. There also is no dispute that the ICRS was available when the Grand Marquis was manufactured in 1995, or that Ford offered it in some of its family vehicles. Ford asserts that it did not offer the ICRS in the Grand Marquis because the majority of consumers who purchased that model were older drivers, like Billy's grandfather. Ms. Meals submits that she would have purchased a vehicle with an ICRS had she been aware of the option. We find this irrelevant, however, where Ms. Meals did not purchase the Grand Marquis.

Ford contends,

> the evidence [at trial], which Plaintiff could not and did not rebut, was that as a "prudent manufacturer" with a safe alternative (the federally-approved three-point restraints system), Ford considered the "usefulness and desirability" of its products and, like the entire automotive industry, decided against wider implementation of the unpopular ICRS, particularly in vehicles like the Grand Marquis that were not considered "family vehicles."

Ford does not dispute that the owner's manual of the Grand Marquis did not specifically warn consumers of the dangers of placing the shoulder strap behind a small child. It asserts, however, that the lack of warning is inconsequential because Ms. Meals concedes that neither she nor Mr. Meals read the owner's manual for the Grand Marquis. Although Ford contends that on-board vehicle warnings were not considered by Ms. Meals' expert witnesses, Ford does not refer us to evidence in the record that would suggest that a warning against this misuse of the seat belt, a misuse which Ms. Meals contends was foreseeable and known by Ford, was included in any on-board warning.

The Grand Marquis was manufactured on March 19, 1995. Mr. Meals, Sr., purchased it in November 1999. He was the third consumer-owner of the vehicle, which was twice sold back to commercial dealerships. There is no assertion that the seat belt restraint system in the Grand Marquis was in any way altered by the previous consumer-purchasers, or by the two commercial dealerships who purchased and re-sold the vehicle after its initial sale in 1995. Further, there is no dispute that the "crush zones" of the Grand Marquis worked as intended. The "safety cage" in which Billy was seated was not compromised. With these background facts in mind, we turn to the issues raised on appeal.

***Denial of Ford's Motions for Directed Verdict***

We turn first to Ford's assertion that the trial court erred by denying its motion for a directed verdict on Ms. Meals' claim for punitive damages and her claim for the failure to warn. A directed verdict is appropriate only when one conclusion reasonably may be reached from the evidence. *Johnson v. Tennessee Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006). If there is any dispute regarding material evidence or any doubt regarding the conclusion to be reached from the evidence, a motion for directed verdict must be denied. *Id*. We review a trial court's disposition of a motion for directed verdict *de novo*, with no presumption of correctness. *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 206 (Tenn. Ct. App. 2008)(citations omitted). Like the trial court, the appellate court "must 'take the strongest legitimate view of the evidence in favor of the non-moving party, construing all evidence in that party's favor and disregarding all countervailing evidence.'" *Sanford v. Waugh & Co., Inc.*, 328 S.W.3d 836, 848 (Tenn. 2010)(quoting *Johnson v. Tenn. Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006)).

In light of the entirety of the record, we affirm the trial court's denial of Ford's motion for directed verdict with respect to Ms. Meals' failure to warn claim. In its brief to this Court, Ford asserts that Billy's enhanced injuries were caused by the misuse of the seat belt. It asserts that the evidence demonstrates that, worn properly and in conjunction with a booster seat, the seat belt system in not unreasonably dangerous. Ford does not contend that the owner's manual of the 1995 Grand Marquis warned against placing the shoulder portion of the three-point seat belt behind a child's back, or that so doing could cause enhanced injuries, however. Rather, it asserts that Ms. Meals concedes that she did not read the owner's manual, and that there was no proof that anyone in the Meals family read the manual. Thus, it asserts that a warning, had one existed, would not have prevented Billy's enhanced injuries.

Ford places significant emphasis on the fact that Ms. Meals did not read the owner's manual for the Grand Marquis, and Ford asserts that there is no proof that anyone in the Meals family read the manual. Ford submits, "[n]o failure to warn could have proximately caused Billy's injuries because the Meals family already knew everything about which Ford supposedly failed to warn." Ford's argument, as we perceive it, is that Ms. Meals knew that a booster seat was a safer alternative, as evidenced by the fact that she had purchased one.

As stated above, however, we note that the Grand Marquis was neither purchased nor owned by Ms. Meals or Mr. Meals, but by Mr. Meals Sr. The evidence simply cannot establish whether Mr. Meals Sr. read the manual, and it is not disputed that there was no warning regarding injury that might result from placing the shoulder strap of the seat belt behind a child. Further, as also noted above, Ford points us to no evidence to suggest that

the Grand Marquis contained an on-board warning. Additionally, Ms. Meals contends that Ford knew that the adult seat belt did not fit children and that it was being placed behind children's backs to keep it from crossing their faces. Upon cross-examination of Ford's design expert, and over Ford's objection, Ms. Meals elicited testimony that, in a 1988 owner's manual, Ford had advised parents to place the shoulder portion of the seat belt behind a child's back in case of an improper fit. We cannot say that the evidence reasonably leads to only one conclusion regarding whether the misuse of the seat belt was known and foreseeable by Ford, and whether Ford's failure to warn of the dangers of that misuse resulted in the enhanced injuries in this case.

Although the jury in this case denied Ms. Meal's claim for punitive damages, Ford asserts that the trial court nevertheless committed reversible error by denying its motion for directed verdict on this claim. Ford asserts that, because the trial court did not dismiss the claim for punitive damages, the jury heard "inflammatory statements that it never should have." Ford submits that the "prejudice flowing from improperly allowing these punitive damages arguments . . . is self-evident given the magnitude of this verdict."

The standards applicable to orders adjudicating a motion for directed verdict under Rule 50 of the Tennessee Rules of Civil Procedure apply to a motion for a directed verdict on a punitive damages claim. *Duran*, 271 S.W.3d at 206 (citations omitted). Thus, when considering the motion, the court must determine whether the evidence, construed in a light most favorable to the opposing party, is sufficient as a matter of law to create a factual issue to be decided by the jury. *Id.* If there is a "reasonable doubt" regarding the conclusions that may be drawn from the evidence, the question should be submitted to the jury. *Id.*

To be entitled to an award of punitive damages, the plaintiff must demonstrate that the acts of the defendant proximately caused his injury, and that those acts "reached a substantially higher level than ordinary negligence." *Id.* (citations omitted). The "plaintiff must prove by clear and convincing evidence that the defendant 'acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly.'" *Sanford v. Waugh & Co.,* 328 S.W.3d at 848 (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn.1992)). The purpose of punitive damages is "to 'punish a defendant, to deter him from committing acts of a similar nature, and to make a public example of him[.]'" *Id*. at 849 (quoting *Goff v. Elmo Greer & Sons Constr. Co.*, 297 S.W.3d 175, 187 (Tenn. 2009) (quoting *Huckeby v. Spangler*, 563 S.W.2d 555, 558-59 (Tenn. 1978)). Therefore, "they are available in 'cases involving only the most egregious of wrongs.'" *Id.* (quoting *Hodges,* 833 S.W.2d at 901). Thus, the Tennessee Supreme Court has reserved punitive damages for conduct that was so reprehensible that it must be both punished and deterred. *Duran*, 271 S.W.3d at 206. Accordingly, "'[w]hen presented with a motion seeking a directed verdict on a punitive damage claim, a court must determine whether there is sufficient evidence, using the clear

and convincing evidence standard, to submit the punitive damage claim to the jury.'" *Sanford*, 328 S.W.3d at 848 (quoting *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 207 (Tenn. Ct. App. 2008); *accord Hughes v. Lumbermens Mut. Cas. Co.*, 2 S.W.3d 218, 227 (Tenn. Ct .App. 1999); *Wasielewski v. K Mart Corp.*, 891 S.W.2d 916, 919 (Tenn. Ct. App. 1994)).

Although the Tennessee Products Liability Act has been amended with respect to punitive damages allowed under it, effective October 1, 2011, we must utilize the Act as it existed at the time this matter was tried.[1]  Upon review under the former version of the Act, the supreme court addressed circumstances similar to those of the present case in *Flax v.*

---

[1]Tennessee Code Annotated § 29-28-104 currently provides:

    (a) Compliance by a manufacturer or seller with any federal or state statute or administrative regulation existing at the time a product was manufactured and prescribing standards for design, inspection, testing, manufacture, labeling, warning or instructions for use of a product, shall raise a rebuttable presumption that the product is not in an unreasonably dangerous condition in regard to matters covered by these standards.

    (b) A manufacturer or seller, other than a manufacturer of a drug or device, shall not be liable for exemplary or punitive damages if:

        (1) The product alleged to have caused the harm was designed, manufactured, packaged, labeled, sold, or represented in relevant and material respects in accordance with the terms of approval, license or similar determination of a government agency; or

        (2) The product was in compliance with a statute of the state or the United States, or a standard, rule, regulation, order, or other action of a government agency pursuant to statutory authority, when such statute or agency action is relevant to the event or risk allegedly causing the harm and the product was in compliance at the time the product left the control of the manufacturer or seller.

    (c) Subsection (b) shall not apply if the claimant establishes that the manufacturer or seller:

        (1) At any time before the event that allegedly caused the harm, sold the product after the effective date of an order of a government agency that ordered the removal of the product from the market or withdrew the agency's approval of the product; or

        (2) In violation of applicable regulations, withheld or misrepresented to the government agency information material to the approval and such information is relevant to the harm which the claimant allegedly suffered.

    (d) The award of punitive or exemplary damages against a manufacturer of a drug or device shall be governed by § 29-39-104.

Tenn. Code Ann. § 29-28-104 (Supp. 2011).

-11-

*DaimlerChrysler Corp*., 272 S.W.3d 521 (Tenn. 2008). The *Flax* court emphasized that, although Tennessee Code Annotated § 29-28-104 provides a rebuttable presumption that a product manufactured in accordance with applicable safety standards is not unreasonably dangerous, the rebuttable presumption was designed "'to give refuge to the manufacturer who is operating in good faith and [in] compliance of what the law requires him to do.'" *Flax v. DaimlerChrysler Corp*., 272 S.W.3d 521, 536 (Tenn. 2008)(quoting *Tuggle v. Raymond Corp*., 868 S.W.2d 621, 625 (Tenn. Ct. App. 1992) (alteration in original)). However, compliance with regulations and/or common practice does not shield a manufacturer from liability or from a claim for punitive damages when the manufacturer knows that compliance is insufficient to protect consumers. *Id.* "To hold otherwise would create an overly inflexible rule that would allow some manufacturers knowingly engaged in reprehensible conduct to escape the imposition of punitive damages." *Id*. In some cases, evidence demonstrating that a manufacturer knowingly "disregarded substantial and unjustifiable risks to the public" defeats evidence that its practice conformed to common industry practice. *Id.* The *Flax* court determined that the jury in that case reasonably could have concluded from the evidence that the defendant car manufacturer knew that compliance with the applicable FMVSS and industry standards with respect to seat design was not sufficient. *Id*. at 536-37. It held that punitive damages accordingly were not barred in that case. *Id.* at 537.

The jury in this case reasonably could have concluded that in 1995 Ford was aware that it was foreseeable that children would be passengers in the rear seat of the Grand Marquis; that compliance with the applicable FMVSS and industry standards for seat belt design was insufficient to properly fit children; that Ford knew of the likelihood that the shoulder strap would be placed behind the child's back to keep it from crossing the child's face; that Ford was aware of the danger resulting from this practice; and that Ford failed to warn against this known practice or to include a safer alternative in all of its vehicles. However, as discussed below, as early as 1993 Ford began to develop materials designed to warn consumers of the dangers of improper seat belt use. Unfortunately, it did not begin to include the material in its vehicles until 1996 or 1997. The record demonstrates that Ford complied with industry standards and governmental regulations. Upon review of the record, we do not find clear and convincing evidence to suggest that Ford acted recklessly, intentionally, maliciously or fraudulently.

Further, as discussed below, shortly after the collision injuring Billy, but considerably before the jury rendered its verdict in this case, the General Assembly filled the policy and safety gaps through which Billy fell. The Tennessee Code now requires anyone transporting a child four through eight years of age and measuring less than four feet, nine inches (4' 9") in height, in a passenger motor vehicle upon a road, street or highway, to properly restrain the child in the rear seat, if available, and in a belt positioning booster seat system that meets

federal motor vehicle safety standards. Tenn. Code Ann. § 55-9-602(a)(3)(2008). Thus, the General Assembly has chosen to fill the safety and policy gap not by requiring manufacturers to install ICRS's in all vehicles, but by requiring the use of booster seats by those who transport children. Punitive damages in this case would not be necessary to deter the complained of conduct, therefore, where the General Assembly has placed the responsibility of providing properly fitting child restraint systems on those who transport children.

We accordingly agree with Ford that the trial court erred in denying its motion for directed verdict on this issue. We do not agree, however, that this constitutes reversible error. As noted above, the jury did not award punitive damages in this case. For reasons addressed below, we are unconvinced by Ford's argument that the damage amount awarded in this case demonstrates a desire to punish, or that permitting the matter to go to the jury prejudiced Ford with respect to the remaining claims.

### *Material Evidence to Support the Jury Verdict*

We turn next to Ford's assertion that there is no material evidence to support the jury's verdict finding Ford 15 percent liable for Billy's injuries. The Tennessee Products Liability Act provides:

> "Product liability action" for purposes of this chapter includes all actions brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging or labeling of any product. "Product liability action" includes, but is not limited to, all actions based upon the following theories: strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent, or innocent; misrepresentation, concealment, or nondisclosure, whether negligent, or innocent; or under any other substantive legal theory in tort or contract whatsoever;

Tennessee Code Annotated § 29-28-102(6)(2000).

This lawsuit is based upon Ms. Meals assertion that "the adult, three-point harness, seat belt restraint system in Ford's 1995 Mercury Grand Marquis was defective and unreasonably dangerous for use by children such as Billy Meals." Ms. Meals asserts that it is uncontested that nothing protruded into the rear passenger area of the vehicle when the accident occurred, but that "[t]he mechanism of [Billy's] injury" was the lap belt portion of the seat belt, which caused Billy to jackknife over the belt. She asserts, that "[t]he loading

of the lap part of the seat belt on his lumbar spine caused lumbar vertebrae to be move[d] relative to each other, so that the space for the spinal cord was intruded resulting in irreparable damage to the cord leading to paraplegia." Ms. Meals asserts that Billy would not have received the catastrophic injuries that led to paraplegia if he had been restrained in an ICRS. She asserts that Ford knew of the unreasonable risk of danger to children posed by the three-point seat belt, and that Ford had a duty to either "design out the defect or otherwise eliminate the danger." Ms. Meals asserts Ford had created a safer alternative, the ICRS, but did not offer or install it in the 1995 Grand Marquis, or warn consumers of the dangerous of the three-point seat belt, and the foreseeable misuse thereof, to children. This lawsuit was submitted to the jury on account of personal injury based on theories of strict liability, negligent design, and the failure warn. As noted above, we cannot ascertain from the verdict form upon which of these theories the jury rendered its verdict in favor of Ms. Meals. Thus, we will address each in turn.

The Tennessee Code provides:

>    (a) A manufacturer or seller of a product shall not be liable for any injury to a person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.
>    (b) In making this determination, the state of scientific and technological knowledge available to the manufacturer or seller at the time the product was placed on the market, rather than at the time of injury, is applicable. Consideration is given also to the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products.
>    (c) The provisions of this section do not apply to an action based on express warranty or misrepresentation regarding the chattel.
>    (d) A product is not unreasonably dangerous because of a failure to adequately warn of a danger or hazard that is apparent to the ordinary user.

Tenn. Code Ann. § 29-28-105(2000). The Code defines a "defective condition" as "a condition of a product that renders it unsafe for normal or anticipatable handling and consumption[.] Tenn. Code Ann. § 29-28-102(2)(2000). It defines "unreasonably dangerous" to mean

>    that a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by

a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition.

Tenn. Code Ann. § 29-28-102(8)(2000). As noted above, section 29-28-104 provides a rebuttable presumption that a product is not defective or unreasonably dangerous if it complies with federal and state regulations.

Tennessee has adopted two tests to determine whether a product is unreasonably dangerous: the prudent manufacturer test and the consumer expectation test. *Brown v. Crown Equipment Corp.*, 181 S.W.3d 268, 282 (Tenn. 2005) Liability is imposed under the prudent manufacturer test "'in circumstances in which a reasonably prudent manufacturer with knowledge of a product's dangerousness would not place the product in the stream of commerce.'" *Id.* (quoting *Ray ex rel. Holman*, 925 S.W.2d 527, 532 (Tenn. 1996)). This test therefore

> imputes knowledge of the product's condition to the manufacturer and requires proof concerning the reasonableness of the decision of the manufacturer to market the product in light of this knowledge. . . .  The buyer's expectations are irrelevant.

*Id.* (citations omitted).

> The test utilizes a risk-utility test and balances several factors,

> including (1) the product's usefulness and desirability; (2) the product's safety aspects-the likelihood and probable seriousness of injury; (3) the availability of a substitute product that would safely meet the same need; (4) the manufacturer's ability to eliminate the product's unsafe character without hindering its usefulness or causing the maintenance of its utility to be too expensive; (5) the ability of the operator or user to avoid danger through the exercise of care in using the product; (6) the user's anticipated awareness of the product's inherent dangers and their avoidability; and (7) the feasibility of the manufacturer spreading the loss by setting the price of the product or maintaining liability insurance.

*Id.* at 282-83 (citation omitted).

Under the consumer expectation test,

> before a product is deemed unreasonably dangerous it must be "dangerous to
> an extent beyond that which would be contemplated by the ordinary consumer
> who purchases it, with the ordinary knowledge common to the community as
> to its characteristics."

*Ray by Holman v. BIC Corp.*, 925 S.W.2d 527, 530 (Tenn. 1996)(quoting Restatement
(Second) of Torts, § 402A, comment i; *Vincer v. Esther Williams All-Aluminum*, 69 Wis.2d
326, 230 N.W.2d 794, 798-99 (1975)). A product is not unreasonably dangerous under this
test "if the ordinary consumer would appreciate the condition of the product and the risk of
injury." *Id.*

In this case, Ms. Meals does not assert that the three-point seat belt was defective or
unreasonably dangerous *per se* for use by adults. Rather, she asserts that it was dangerous
or defective when used by children because it did not properly fit children of Billy's size.
She contends that Ford knew children were likely to be passengers in the rear seat, and that
Ford should be held liable under theories of strict liability and negligence for the failure to
install or offer ICRS's in the Grand Marquis. She asserts that Ford offered the ICRS in
some models, but not all, and quotes *Ellithorpe v. Ford Motor Company*, 503 S.W.2d 516,
519 (Tenn. 1973), for the proposition that, under a strict liability theory, Ford had a duty to
design its product as safely as reasonably possible. Ms. Meals' argument, as we perceive it,
is that it was foreseeable that children would be passengers in the rear seat of an automobile,
and Ford's failure to offer the safer ICRS in the Grand Marquis amounted to a defect or
unreasonably dangerous condition such that Ford should be held strictly liable for injuries
resulting from use of the three-point system. She further asserts that Ford knew that the
three-point system did not properly fit children, that it knew adults were placing the shoulder
strap behind children's backs, and that Ford at one time advised this practice. She submits
that Ford had designed the five-point harness system but did not advertise it, and asserted
"[w]e had no way of knowing [Billy] was in danger." She asserts she would have bought an
ICRS if it had been available. Ford, on the other hand, contends that the seat belt was
misused by Billy, that it was safe for ordinary use, and that Ms. Meals knew that a booster
seat would assist in securing the seat belt for use by a child. Ford asserts the three-point seat
belt was safe for normal, ordinary use, and not unreasonably dangerous when used correctly.

It is well-settled that we will allow all reasonable inferences to uphold a jury verdict,
and will set-aside a jury verdict only if there is no material evidence to support it. *E.g.,
Goodale v. Langenberg*, 243 S.W.3d 575, 583 (Tenn. Ct .App. 2007). Upon review, this
Court will not re-weigh the evidence, but will take the strongest view possible of the
evidence in favor of the prevailing party, and discard evidence to the contrary. *Id.*

Upon review of the voluminous record in this case, we find material evidence to support a finding that a five-point ICRS is superior to the adult, three-point seat belt to protect children from injury in automobile collisions. There is no dispute that such a system was available when the Grand Marquis was manufactured. Ford asserts, however, that Plaintiff's experts opined that had the three-point system been properly used, Billy's injuries would have been far less severe. It further asserts that the seat belt did not cause the accident, that it did not fail to perform, and that Billy's enhanced injuries resulted from the undisputed misuse of the seat belt. Ford contends that its three-point seat belt system met all federally required standards, and that current regulations require all rear-seating positions in new cars to be equipped with the three-point lap and shoulder belts, not ICRS's.

"[E]vidence of a technologically feasible and practical alternative design that likely would have reduced or prevented plaintiff's harm will always be highly relevant and probative of the issue of whether a product was defective or unreasonably dangerous." *Potter v. Ford Motor Co.*, 213 S.W.3d 264, 269 (Tenn. Ct. App. 2006). As Ms. Meals emphasizes, children like Billy fell into a safety and policy gap. She asserts that Ford knew of this gap, had designed a feasible and practical alternative, and should be held strictly liable for failing to offer the safer alternative in all its vehicles when it knew children like Billy were likely to be passengers. However, as noted above, the General Assembly subsequently has filled the policy gap into which Billy fell. As adopted in 2003 and effective July 1, 2004, the Tennessee Code currently provides, in relevant part:

> Notwithstanding § 55-9-603, any person transporting any child, four through eight (4-8) years of age and measuring less than four feet, nine inches (4' 9") in height, in a passenger motor vehicle upon a road, street or highway of this state is responsible for the protection of the child and properly using a belt positioning booster seat system, meeting federal motor vehicle safety standards in the rear seat if available or according to the child safety restraint system or vehicle manufacturer's instructions.

Tenn. Code Ann. § 55-9-602(a)(3)(2008). Thus, the General Assembly has chosen to fill the safety gap by requiring children under 57 inches to be seated in a properly restrained booster seat. Billy, who was 47 inches at the time of the accident, would have fallen squarely into this protective statute.

As noted above, we provided the parties with an opportunity to submit supplemental briefs to address the implications of this statute on the arguments forwarded in this matter. In its supplemental brief, Ford asserts that the verdict in this case

> can and will do damage to that existing Tennessee law and longstanding public

policies of protecting children riding in vehicles by holding parents and adults primarily responsible for ensuring proper restraints use and determining the best individualized fit for the child.

Ford further asserts that "this verdict sends the message that the manufacturer is responsible for ensuring the safety of improperly restrained children." Ford submits that Billy was injured because he was not properly restrained, as Ms. Meals testified she knew he should be, and because he was not restrained in a booster seat even though the Meals family owned one. Ford asserts, "Plaintiff knew [Billy] should have been in a booster seat if his belt did not properly fit him - that is why she purchased one." In its primary brief, Ford emphasizes that the misuse of the three-point system exacerbated Billy's injuries. Ford directs us to the testimony of Plaintiff's expert, Michael Griffiths (Mr. Griffiths), who testified that misuse of the seat belt allowed the lap belt to "slide up into the abdomen," causing internal injuries and transmitting all the forces to Billy's spine. Ford asserts that Mr. Griffiths acknowledged that Billy would have experienced only half of the crash forces had he been wearing both the lap and shoulder belts because those forces would have been distributed across two belt straps instead of only one. Ford also directs us to the testimony of its expert, Dr. Debra Marth (Dr. Marth), who testified that, because the three-point belt is a unitary restraint, misrouting the shoulder portion of the system behind the back also affects the fit of the lap portion, lifting the latter up on the abdomen and resting it on the soft abdomen rather than "boney pelvis," which can better sustain crash forces. Consequently, the occupant is more vulnerable to internal injuries transferred through the abdomen, such as the ones suffered by Billy.

In her supplemental brief, Ms. Meals quotes statements made by the president of Ford in 2001, and asserts that the proof demonstrates that

> Ford knew of the real risk of catastrophic injuries to children like Billy Meals during front end collisions because it knew there existed a "child safety gap" in which "no protection" was afforded to those children who were riding unprotected "in adult safety belts that do not fit."

She asserts that Ford's safety expert testified that the public was unaware of the danger posed to children from use of the three-point adult seat belt, and that Ford knew the three-point system posed a threat of catastrophic injury to millions of American children. She further asserts that Ford had developed a reasonable, safer alternative, and that it knew that children like Billy were likely to misuse the three-point system. She argues that nothing in Tennessee Code Annotated §§ 55-9-601 through 605 "even hints at changing, reducing or absolving Ford of its liability in this cause." Ms. Meals asserts that the amendments made after 2002 do not affect the duty owed by Ford in 1995 and 2002, or the Meals' right to have the matter

decided by a jury. She quotes *Ellithorpe v. Ford Motor Co.*, 503 S.W.2d 516 (Tenn. 1973), which stated:

> We . . . adopt the reasoning of *Larsen v. General Motors Corp.*, 391 F.2d 495 (8th Cir. 1968). The court there held that collisions are clearly foreseeable by the manufacturer and that he therefore has a duty to minimize the harm of inevitable accidents by utilizing reasonably safe design. This does not require construction and design of an automobile that will be absolutely safe in a collision. It does require the manufacturer to design an automobile which, in the event of an accident, is 'as safe as is reasonably possible under the present state of the art.' *Larsen v. General Motors Corp.*, supra. We agree with defendant that abnormal use of a product is generally a defense in strict liability cases. *Higgins v. Paul Hardeman Inc.*, 457 S.W.2d 943 (Mo. App.1970). However, the use of the product will not bar recovery if it is reasonably foreseeable by the manufacturer.

Ms. Meals asserts the intent of the Legislature in enacting laws requiring child safety seats was to establish a policy of protecting children, not to change the law with respect to strict liability or products liability. Ms. Meals acknowledges the evidentiary exception for products liability cases contained in Tennessee Code Annotated § 55-9-604, permitting evidence of the failure to wear a safety belt in a products liability action, however. She argues that nothing in the statutory scheme alters the public policy of the State to hold automobile manufactures liable for negligence and/or defective and/or unreasonably dangerous seat belts. Ms. Meals further argues that the 2003 amendments do not impact Ford's liability for injuries caused by a seat belt system that was dangerous for use, and by reason of foreseeable misuse, by children in collisions occurring prior to the statutory amendments.

The parties agree that Billy fell into a policy gap. We concur. Ms. Meals asserts that the gap should be filled by holding car manufacturers liable under theories of strict liability or negligence for injuries allegedly enhanced by the intentional misuse of the ill-fitting three-point system because the misuse was foreseeable and a safer alternative was available in the form of an ICRS. In legislation that was enacted in 2003 and became effective in 2004, however, the General Assembly closed this policy gap by requiring those transporting children like Billy to restrain them in an approved booster seat. In light of this action taken by the General Assembly, and our holding on the jury verdict with respect to Ms. Meals' claim of negligent failure to warn, we find it unnecessary to address Ford's issues with respect to Ms. Meals' claims based on strict liability and negligent design.

By 2003, the General Assembly clearly had recognized that three-point seatbelts do

not adequately restrain small children or protect from injury in case of collision. Ms. Meals asserts that Ford should be held liable for the failure to warn against the danger posed to children by ill-fitting three-point seatbelts and the foreseeable misuse of the inadequate restraint. "Tennessee courts have long held that a manufacturer may be held strictly liable for failing to warn consumers of the dangers of a particular product at the time of sale" in a traditional failure to warn action. *Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 541 (Tenn. 2008)(citations omitted). A claim for failure to warn is also valid in a product liability action. *Id*. (citing Tenn. Code Ann. § 29-28-102(6) (2000)). Generally,

> a manufacturer will be absolved of liability for failure to warn for lack of causation where the consumer was already aware of the danger, because the failure to warn cannot be the proximate cause of the user's injury if the user had actual knowledge of the hazards in question.

*Harden v. Danek Med., Inc.*, 985 S.W.2d 449, 451 (quoting 63A Am. Jur.2d Products Liability §1162 (1984)). To be adequate, however, a warning must be "calculated to bring home to a reasonably prudent user of the product the nature and the extent of the danger involved in using the product.'" *Evridge v. Am. Honda Motor Co.*, 685 S.W.2d 632, 636 (Tenn. 1985)(quoting *Trimble v. Irwin*, 441 S.W.2d 818, 822 (1968)). Unless reasonable minds could not disagree, the question of whether the warning was adequate must be determined by the jury. *Id.* (citation omitted).

Ford asserts that it cannot be held liable for the failure to warn because Ms. Meals conceded that she had not read the Ford owner's manual, and that there is no evidence that anyone in the Meals family ever read the manual. It also contends that the expert testimony related only to the content of the warnings in the owner's manual, and did not consider any on-board warnings. Ford points us to no evidence in the record of on-board warnings, however. Ford also asserts that Ms. Meals knew "everything about which [she] claim[s] Ford should have warned." Ford submits the Meals family knew that allowing Billy to ride with the shoulder belt behind his back was a misuse of the three-point seat belt. Ford also submits that Ms. Meals' knowledge that a booster seat provided a safer alternative to placing the shoulder strap behind Billy's back is demonstrated by the fact that she had purchased a booster seat for Billy.

Ms. Meals, on the other hand, asserts that expert testimony revealed that the increased danger created from putting the shoulder belt behind the back was a hidden hazzard. She also asserts that Ford knew of the misuse of the seat belt, and that expert testimony supports the assertion that Ford knew of the likelihood of injury. She further points to statements made by Ford executives acknowledging that the adult restraints did not fit children, and that parents in America were unaware that their children were being transported while improperly

restrained.

Upon review of the record, we agree with Ms. Meals that the record contains material evidence that, in its 1995 vehicles, Ford failed to warn of the "hidden hazzard" of the foreseeable misuse of placing the shoulder strap behind children because it simply did not fit them. It is clear from the record that, during the 1990's and into the early 2000's, the automobile industry, including Ford, increasingly recognized the need to provide better protection for children who had outgrown a toddler car seat but were not large enough to properly wear a three-point seat belt. Over Ford's objection, Ms. Meals questioned Ford's expert, Dr. Marth, a safety forensics expert who formerly worked for Ford, about a January 1993 document entitled "Subsystem Design Specifications Subsystems 1.10 and 1.20 Integrated Child Restraint System." According to that document, the ICRS accommodated a child 1 to 6 years of age and weighing 20 to 60 pounds. Thus, by 1993, Ford had designed a safer alternative to adult seat belts for children.

The trial transcript also contains the deposition of Michael J. Stando (Mr. Stando), Ford's manager of car programs within the automotive safety program, who testified about Ford's efforts to raise awareness about the importance of placing children like Billy in booster seats. Mr. Stando's testimony reveals that, at least as early as 1993, Ford had begun drafting safety brochures designed to increase awareness among consumers. Mr. Stando testified that, by 1993, Ford had developed a "solid first draft" of a safety brochure advising consumers that children should be placed in booster seats and warning that "a major challenge in designing occupant protection for children is the fact that a child is not a smaller version of an adult. The body proportions of children are different from that for adults." In 1996 or 1997, Ford began placing a safety advice card in all new vehicles, advising consumers that booster seats position a "child up so that the lap belt rests low and snug across the hips . . . and position the shoulder belt snug across the middle of the chest." The card also cautioned that

> when children outgrow a typical forward-facing safety seat, they are still too small for adult-sized safety belts. And while using a safety belt is always better than not using one, a safety belt that does not fit properly may not provide protection. A safety belt that is too big can allow a child to slide out in a crash and be ejected from the vehicle. A lap belt that rises up on a child's stomach instead of resting low and snug across the hips can cause serious and sometimes fatal injuries in a crash.

The safety information further warned that "children who put the shoulder belt behind them or under their arm can suffer serious injuries to the head, internal organs, or spine in a crash." In April 2001, Ford launched its "Boost America!" campaign to promote the use of booster

seats. Tennessee did not require parents to utilize booster seats until 2004. Additionally, although not relevant to Ford's practice in 1995, the 1988 Ford Aerostar manual advising parents to place the shoulder strap behind a child if it did not fit properly is relevant evidence demonstrating that Ford was aware that such misuse was likely to occur.

This small sliver of the record demonstrates the evolution of Ford's efforts and attention to the difficulty of safely restraining children. It provides material evidence to demonstrate that, sometime between 1988 and 1993, Ford recognized that adult seat belts did not fit children and were inadequate to protect them; that placing the shoulder strap of a three-point seat belt behind a child's back or under a child's arm was unsafe and could cause enhanced injury to children; and that an ICRS or booster seat was a superior alternative. By 1997, Ford clearly was warning consumers about the dangers of improper seat belt use, and by 2001 it was advocating the use of booster seats. In 1995, it was not.

Although Ford asserts that there is no evidence that anyone in the Meals family read the owner's manual, and that a warning therefore would have been futile, neither Ms. Meals nor Mr. Meals owned the vehicle. Ford did not plead the comparative fault of Mr. Meals Sr., the owner of the vehicle, who would have had the duty of reading the manual.

Dr. Martha testified that "ultimately, there are some crashes that are just so severe that you can't protect against all injuries." When asked whether Ford could design a system that would protect all children in a collision as severe as the one in this case, she replied, "that wasn't something that was possible in 1995; and even today, it's something that's not possible." Ford additionally asserts that the accident in this case was more severe than 99.9 percent of all vehicular collisions, and the severity of the impact was therefore unforseeable. We have opined that

> [t]he foreseeability requirement is not so strict as to require the tortfeasor to foresee the exact manner in which the injury takes place, provided it is determined that the tortfeasor could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred.

*Potter v. Ford Motor Co.*, 213 S.W.3d 264, 275-76 (Tenn. Ct. App. 2006)(citations omitted). "'The fact that an accident may be freakish does not *per se* make it unpredictable or unforeseen.'" *Id*. at 276 (quoting *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (1991) (quoting *City of Elizabethton v. Sluder*, 534 S.W.2d 115, 117 (Tenn.1976))). "It is sufficient that harm in the abstract could reasonably be foreseen." *Id.* (citation omitted). A seat belt serves no other purpose other than to protect passengers, particularly in a collision, especially in a horrific collision.

-22-

In light of the foregoing we affirm the jury verdict assessing liability against Ford based on the failure to warn.

### The Amount of the Damage Award

We next turn to Ford's assertion that the jury's award of compensatory damages in the amount of $43.8 million was excessive, beyond the range of reasonableness, and improperly motivated by a desire to punish. We review a jury's award of damages under the material evidence standard, and will affirm the jury's judgment if it is supported by material evidence. *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 210 (Tenn. Ct. App. 2008). It is well-settled, however, that the amount of a damage award may be so great that it demonstrate passion, prejudice, or caprice on the part of the jury. *Id.* at 212 (citing *Am. Lead Pencil Co. v. Davis*, 108 Tenn. 251, 258, 66 S.W. 1129, 1130 (1901)). We may disturb a jury verdict when it is sufficiently excessive or unconscionable so as to "shock[] the judicial conscience and amount[] to a palpable injustice." *Id.* (citations omitted). When considering whether a jury's award of damages should be set aside based solely on the amount of the award, we

> must consider the nature and extent of the plaintiff's injuries, the pain and suffering the plaintiff experienced, the expenses the plaintiff incurred as a result of the injuries, the plaintiff's loss of earning capacity as a result of the injuries, the impact the injuries have had on the plaintiff's enjoyment of life, and the plaintiff's age and life expectancy.

*Id*. (citations omitted). We begin, however, "with a presumption that juries are honest and conscientious and they have followed the instructions given to them." *Id.* (citations omitted).

"[N]ext to the jury the most competent person to pass upon the [verdict] is the judge who presided at the trial and heard the evidence." *Thrailkill v. Patterson*, 879 S.W.2d 836, 841 (Tenn. 1994)(citation omitted). "'Much of the importance and weight attached to jury trials proceeds from the presumption that an intelligent and learned Circuit Judge, accustomed to weighing evidence, has scrutinized the proof, looked into the faces of the witnesses, and indorsed the action of the jury.'" *Id.* (quoting *Tennessee Coal & R.R. v. Roddy*, 85 Tenn. 400, 5 S.W. 286, 288 (1887)).

Ford submits that there is no material evidence to support the amount of damages in this case. Ford asserts that Ms. Meals presented evidence of economic damages suffered by Billy in the amount of approximately $4.3 million at most. It submits that the parties did not dispute the extent of Billy's injuries at trial, and asserts that the economic damages supported by the evidence include medical expenses in the amount of $552,920; lost earning capacity in the amount of $2,262,879; and future life-care expenses in the amount of $1,479,340.

Ford contends that the jury's award of noneconomic damages in excess of $39 million is "manifestly beyond the 'range of reasonableness'" and reflects passion, prejudice and caprice. It also asserts that the "sheer magnitude" of the award, when compared with amounts awarded in other cases, demonstrates that the compensatory award contains a punitive component.

Ms. Meals, on the other hand, argues that the jury's assessment of only 15 percent fault to Ford for Billy's enhanced injuries demonstrates that the verdict does not include a punitive component. She does not challenge Ford's assertion that Billy's economic damages did not exceed $4.3 million, but asserts that the extent of Billy's injuries, including pain and suffering and loss of enjoyment of life, justify the jury's award of noneconomic damages. She further asserts that the damages assessed against Ford and approved by the trial court in the amount of $6.57 million is not excessive.

We agree with Ms. Meals that the jury's allocation of fault in this case belies Ford's contention that the jury's award of damages was motivated by a desire to punish. However, the award of noneconomic damages in excess of $39 million suggests passion in the form of sympathy. Although the jury's allocation of fault considerably reduces the amount for which Ford is liable, our review must focus on whether the total damages awarded to Billy, as opposed to those for which Ford is liable, is within the range of reasonableness.

Noneconomic damages may include pain and suffering, permanent impairment or disfigurement, and past and future loss of enjoyment of life. *Overstreet v. Shoney's*, 4 S.W.3d 694, 715 (Tenn. Ct .App. 1999). Although all of these damages may be categorized as damages for "pain and suffering," they represent distinct losses to the injured party. *Id.* "Pain and suffering" includes physical and mental discomfort, in addition to the "'wide array of mental and emotional responses' that accompany the pain, characterized as suffering, such as anguish, distress, fear, humiliation, grief, shame, or worry." *Id.* (citations omitted). A permanent injury is one from which the injured party cannot recover completely and is distinct from pain and suffering. A permanent injury "prevents a person from living his or her life in comfort by adding inconvenience or loss of physical vigor." *Id.* (citation omitted). Disfigurement is a form of permanent injury. It "impairs a plaintiff's beauty, symmetry, or appearance. . . . Permanent injury may relate to earning capacity, pain, impairment of physical function or loss of the use of a body part . . . or to a mental or psychological impairment." *Id.* (citations omitted).

Noneconomic damages are difficult to quantify "and do not lend themselves to easy valuation." *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 210 (Tenn. Ct. App. 2008)(citations omitted). We have noted that "'[t]he jury trial guarantee requires that the subjective element involved be that of the community and not of judges.'" *Id*. (quoting Case

Comment, *Pennsylvania Supreme Court Reduces Jury Verdict Without Granting Plaintiff Alternative of a New Trial*, 113 U. Pa. L. Rev. 137, 141 (1964); *see also* W. Wendell Hall, *Standards of Review in Texas*, 38 St. Mary's L. J. 47, 215-16 (2006); J. Patrick Elsevier, Note, *Out-of-Line: Federal Courts Using Comparability to Review Damage Awards*, 33 Ga. L. Rev. 243, 245-46 (1998); Diana Garcia, Comment*, Remittitur in Environmental Cases: Developing a Standard of Review for Federal Courts*, 16 B.C. Envtl. Aff. L. Rev. 119, 134-35 (1988)). Accordingly, when reviewing a jury's award of noneconomic damages, it is not this Court's "prerogative to determine whether the award strikes [us] as too high or too low." *Id*. (citations omitted). Rather, this Court must review the evidence contained in the record "'to determine whether material evidence supports a finding that the jury award is within the range of reasonableness and not excessive.'" *Id*. (quoting *Dunn v. Davis*, No. W2006-00251-COA-R3-CV, 2007 WL 674652, at *9 (Tenn. Ct .App. Mar.6, 2007) (No Tenn. R .App. P. 11 application filed)).

Billy irrefutably suffered horrific injuries. We believe the jury's assessment of noneconomic damages in an amount exceeding $39 million, in combination with its assessment of 15 percent of fault against Ford, demonstrates sympathy and a desire to provide Billy full compensation for his economic damages in addition to his pain and suffering. As recently re-emphasized, jurors are "after all human" and may be "swayed to a more or less extent by their feelings." Such feelings are not "inconsistent with an honest intention." Passion in the form or sympathy does not necessarily result in "a verdict that is infected with corruption" or a "dishonest verdict." *Palanki ex rel. Palanki v. Vanderbilt Univ.*, 215 S.W.3d 380, 387 (Tenn. Ct. App. 2006) (quoting *Jenkins v. Commodore Corp. S.*, 584 S.W.2d 773, 778 (Tenn.1979) (quoting *Reeves v. Catignani*, 157 Tenn. 173, 176, 7 S.W.2d 38, 39 (1928))). We believe the jury's award of noneconomic damages in this case arose from "human" feelings "not inconsistent with an honest intention" to secure an award for Billy in an amount exceeding his economic damages and compensating him for extreme pain and suffering.

As Ms. Meals submits, the verdict against Ford for the percentage of fault assigned to it results in a judgment in the amount of $6,570,000. However, as noted above, our review is confined to the total award of compensatory damages, and an award in excess of $39 million in noneconomic damages is excessively high when compared to similar cases. *See Potter v. Ford Motor Co.*, 213 S.W.3d 264 (Tenn. Ct. App. 2006)(awarding plaintiff of 42-years of age, who was permanently paralyzed from the chest down after sustaining injuries in an automobile collision in which the back of her seat collapsed, causing her to "submarine" beneath her seatbelt and strike the rear seat back, compensatory damages in the amount of $10 million).

In its order denying Ford's motion for judgment in accordance with its motion for

directed verdict and motion for a new trial, the trial court stated that it had reviewed the evidence in its role as thirteenth juror and denied Ford's motions. When a trial judge has evaluated a jury verdict and considered a remittitur or additur, we are loathe to disturb the court's judgment on appeal. *See Thrailkill v. Patterson*, 879 S.W.2d 836, 840 (Tenn. 1994). In this case, however, Ford did not seek remittitur in the trial court, and the trial court did not suggest one. Although our authority is "more circumscribed" than that of the trial courts, appellate courts may suggest a remittitur where the trial court has not. *Coffey v. Fayette Tabular Prods.*, 929 S.W.2d 326, 331 (Tenn.1996).

As we have stated previously, this Court is not insensitive to the fact that, in a larger sense, it is not possible to place a dollar value on Billy's pain and suffering. *See Dunn v. Davis*, 2007 WL 674652, at \*13. Courts utilize the tool of remittitur to cure excessive damage awards without the costs associated with a new trial. *Thrailkill*, 879 S.W.2d at 840 (citing *Alabama Great S.R.R. v. Roberts*, 113 Tenn. 488, 493, 82 S.W. 314, 315 (1904); *see generally*, Comment, 24 Tenn. L. Rev. 1155 (1957)). In 1911, the General Assembly enacted what is now codified at Tennessee Code Annotated § 20–10–102 concerning remittitur. In 1969, it enacted provisions now codified at Tennessee Code Annotated § 20–10–101 providing for additur. *See also* Tennessee Code Annotated § 20-10-103. These statutes permit trial and appellate courts to correct errors regarding the amount of damages awarded by a jury. *Id.* They "recognize the inherent power of trial courts to 'suggest' an additur or remittitur as an alternative to a new trial." *Id.* The Tennessee Supreme Court has held that an excessive jury verdict may be cured by remittitur. *Id.*

"The practice of using additur and remittitur is in the interest of the sound administration of justice." *Foster v. Amcon Intern.*, Inc., 621 S.W.2d 142, 147 (Tenn. 1981). We have noted, however, that an additur or remittitur that "totally destroys" a jury verdict is not permissible. *Guess v. Maury*, 726 S.W.2d 906, 912 (Tenn. Ct. App. 1986)(overruled on other grounds by *Elliott v. Cobb*, 320 S.W.3d 246 (Tenn. 2010). There is no mathematical formula for determining whether a court's remittitur of a jury verdict "totally destroys" the verdict, however. *E.g., Lashlee v. Harper's Chrysler*, No. M2007-00443-COA-R3-CV, 2008 WL 3983120, at \*12 (Tenn. Ct. App. Aug. 27, 2008). Additionally, upon review of a trial court's remittitur of a jury verdict, we may reduce the award further if we find it is still excessive and contrary to a preponderance of the evidence. *Long v. Mattingly*, 797 S.W.2d 889, 896 (Tenn. Ct. App. 1990).

The record contains substantial and material evidence to support the jury's verdict with respect to economic damages in the amount of $4.3 million. To the extent to which the jury's verdict awards Billy economic damages, we affirm that part of the award in toto. We reduce the noneconomic damages awarded in this case to $8.6 million, an amount that is approximately equal to twice the proven quantifiable economic damages. Thus, the total

damage award is reduced to $12.9 million. In light of Billy's age and health at the time of the accident, we believe this is consistent with damages awarded in similar cases. *See Potter v. Ford Motor Co.*, 213 S.W.3d 264 (Tenn. Ct. App. 2006).

### *Asserted Evidentiary and Procedural Errors*

We turn finally to Ford's assertion that the trial court made numerous erroneous rulings with respect to the admission of evidence and the presentation of Ms. Meals' rebuttal that constitute reversible error and "cumulatively tainted the entire trial." We review a trial court's decisions to admit or exclude evidence under an abuse of discretion standard. *Biscan v. Brown*, 160 S.W.3d 462, 468 (Tenn. 2005)(citation omitted). A trial court abuses its discretion "only when it 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn.2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn.1999)). This standard does not permit an appellate court to substitute its judgment for that of the trial court. *Id*. (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn.1998)). The abuse of discretion standard "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,'" and thus "'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010) (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

Ford asserts that the trial court erred in admitting "harmful evidence and argument regarding an irrelevant governmental study"; by "precluding Ford from introducing an exemplar of an ICRS"; by permitting Ms. Meals to "introduce prejudicial documents through attorney argument pursuant to Rule 44A of the Tennessee Rules of Civil Procedure rather than through a witness"; and by excluding evidence proffered by Ford by "improperly rais[ing] the standard of authentication." As noted, this matter culminated in a seven week trial. The transcript is voluminous, and the exhibits considerable. Both parties offered substantial evidence; both raised numerous objections. We find no abuse of discretion on the part of the trial court with respect to the evidentiary decisions raised for our review.

Ford also asserts that the trial court erred in allowing Ms. Meals to put on rebuttal evidence and to present testimony upon rebuttal which she could have presented in her case in chief. The trial court has wide discretion to allow or disallow rebuttal testimony. *Estate of Glasgow v. Whittum*, 106 S.W.3d 25, 29 (Tenn. Ct. App. 2002)(citation omitted). Its decision will not be disturbed on appeal absent an abuse of discretion. *Id.* Additionally, because it has presided over the proceedings, the trial court

is in "the best position to make determinations regarding how to achieve [the]

primary purpose [of ensuring a fair trial], and absent some abuse of the trial court's discretion in marshaling the trial, an appellate court should not redetermine in retrospect and on a cold record how the case should have been better tried."

*State v. Harris*, No. W2010-02512-CCA-R3-CD, 2012 WL 29203, at*9 (Tenn. Crim. App. Jan. 5, 2012)(quoting *State v. Franklin*, 714 S.W.2d 252, 258 (Tenn.1986)).  We find no abuse of discretion on the part of the trial court.

We turn finally to Ford's assertion that the trial court erred in allowing Ms. Meals to cross examine Ford's design expert regarding the 1988 Ford Aerostar manual.  Ford contends that the manual was "irrelevant and unduly prejudicial;" that Ms. Meals had never read the manual; and that the advice contained in it, advising parents to place the shoulder portion of the three-point restraint behind their children's backs in case of improper fit, was out-dated and irrelevant.  Although we agree that the manual was irrelevant with respect to what Ford advised in 1995, when the Grand Marquis was manufactured, or in 1999, when it was purchased by Mr. Meals Sr., it is relevant with respect to whether this "misuse" was forseeable and known by Ford.  We find no abuse of discretion by the trial court.

### *Holding*

In light of the foregoing, the jury's verdict with respect to liability is affirmed on Ms. Meals' claim of failure to warn.  We remand this matter for further proceedings with a suggestion of remittitur of the compensatory damages award, reducing the total award of compensatory damages to twelve million, nine hundred thousand dollars ($12,900,000.00). Costs of this appeal are taxed one-half to the Appellee, Aundrey Meals, and one-half to the Appellant, Ford Motor Company, and its surety, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE